RICHARD KOVNER AND JOYCE KOVNER, PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 39751-85.          Filed June 20, 1990.

*Larry Kars,* for the petitioners.
*William F. Halley* and *Michael R. Rizzuto,* for the
respondent.

## OPINION

COLVIN, *Judge:* The sole issue for decision is whether
petitioner Richard Kovner was a "commodities dealer in the
trading of commodities" within the meaning of section
108(b) of the Deficit Reduction Act of 1984, Pub. L. 98-369,
98 Stat. 630, as amended by section 1808(d) of the Tax
Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817. As
described below, we hold that petitioner was not a "com-
modities dealer in the trading of commodities" for purposes
of section 108(b).

The parties agreed to submit this case for the limited
purpose of deciding whether petitioner was a commodities

dealer in the trading of commodities under section 108(b). We treat this as we would a motion for partial summary judgment. Other issues were left for later disposition. Thus, this opinion does not decide whether petitioners may deduct commodities losses under section 108(a).

Respondent determined deficiencies in petitioners' 1980 and 1981 Federal income taxes of $104,528 and $27,831, respectively, and additional interest pursuant to section 6621(c), formerly section 6621(d).

Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for the year at issue. Also, unless otherwise noted, the term "section 108" refers to section 108 of the Deficit Reduction Act of 1984, as amended by the Tax Reform Act of 1986.

## Factual Background

The issue of petitioner Richard Kovner's status as a commodities dealer for purposes of section 108 was submitted fully stipulated.

Petitioners resided at Emerson, New Jersey, at the time they filed their petition. Petitioners filed joint income tax returns for 1980 and 1981, the years in issue. All references to petitioner, singularly, are to Richard Kovner.

### 1. *Petitioner's Commodities Industry Registrations*

Since 1975, petitioner has been registered with the Commodity Futures Trading Commission (CFTC) as an associated person of Rosenthal & Co., a futures commission merchant (FCM). An associated person (AP) is a partner, officer, or employee of a futures commission merchant (or an agent thereof) who solicits or accepts customers' orders, other than in a clerical capacity (or a person who supervises persons so engaged). 7 U.S.C. sec. 6k (1981); 17 C.F.R. sec. 1.3(aa) (1981). An FCM is an individual, corporation, or partnership, etc., that engages in soliciting or accepting orders for purchase or sale of any commodity for future delivery subject to the rules of any contract market, and that, in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result therefrom. 17

C.F.R. sec. 1.3(p) (1981). FCM's have been likened to brokerage houses in the securities business. See 1 P. Johnson, Commodities Regulation 101 (1st ed. 1982).

Petitioner was not a member of a commodities exchange (i.e., a contract market). A member of a contract market is an individual, corporation, partnership, etc., who owns or holds membership in a contract market or who is given members' trading privileges thereon. 17 C.F.R. sec. 1.3(q) (1981).

Petitioner was not a floor trader. A floor trader is a member of a contract market who, on the floor of such market, executes a futures trade or a commodity option transaction for his own account or an account controlled by him, or has such a trade made for him. 17 C.F.R. sec. 1.3(x) (1982).

Petitioner was not a floor broker. A floor broker is any person who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, purchases or sells for any other person any commodity for future delivery subject to the rules of any contract market. 17 C.F.R. sec. 1.3(n) (1981).

Petitioner, as an associated person employed by a futures commission merchant, was required to use the services of floor brokers to execute orders.

On January 5, 1976, petitioner registered as a registered commodity representative (RCR) on the Chicago Board of Trade (CBOT). As defined by CBOT rules and regulations (CBOT rule 938.00), an RCR is a member or nonmember who solicits, accepts, or services business for a member. Petitioner's registration remained in effect until March 11, 1986. The CBOT also requires registration of members, membership interest holders, floor clerks, and broker's assistants.

Only a member can conduct transactions or execute orders in securities or commodities upon the floor of the CBOT. CBOT rule 301.00. There are three types of membership: full, associate, and conditional associate. Certain restrictions apply to floor trading by associate and conditional associate members. CBOT rules 211.00 and 212.00. Associate memberships are issued in 1/4 participation (membership interests) and are freely transferrable to any approved applicant. CBOT rule 211.00.

Neither the CFTC nor the CBOT limit contract market memberships to those employed in particular occupations or living in specific geographic areas. See 17 C.F.R. sec. 1.3(q); CBOT rule 200.00 et seq.[1]

Petitioner was also registered during 1976 with the Chicago Mercantile Exchange (CME). Both the CBOT and CME are domestic boards of trade and are designated as a contract market by the CFTC.

2. *Petitioner's Entry Into the Commodities Industry and Employment With Rosenthal & Co.*

In 1976 and 1977, petitioner engaged in a program of learning and studying the commodities market. He read commodities books and periodicals, made contacts in the commodities industry, and began to keep commodity price charts. In addition, he also began "paper trading," i.e., imaginary trading. In 1978, petitioner began to engage in commodities transactions on his own account. Petitioner decided which commodities to buy and sell.

During 1980 and 1981, petitioner was employed as an account executive by Rosenthal & Co. (Rosenthal). As a futures commission merchant (FCM), Rosenthal was in the business of executing, as agent, commodities futures contracts at the direction of and for the account of its customers. Petitioner's responsibilities as an account executive included: soliciting customers for the purpose of opening commodity futures trading accounts with Rosenthal, providing information to customers regarding trends and other developments affecting various commodities, making recommendations regarding the purchase or sale of particular commodity futures contracts, and accepting and placing orders on behalf of customers.

Petitioner was a salesman for Rosenthal. He placed orders for customers, which were then forwarded to the trading floor for execution.

To place an order for customers, petitioner wrote an order ticket which reflected the commodity, quantity, and price of

---

[1]It has been said that "Memberships are broadly held both occupationally and geographically. Bankers, investment bankers, mortgage bankers, money market dealers, commercial manufacturing firms, brokers, futures commission merchants, and individuals such as lawyers, dentists, farmers, and shopkeepers own memberships." M. Powers and D. Vogel, Inside the Financial Futures Market 18 (1st ed. 1981).

the futures contract to be purchased or sold. The order ticket was then given to the Rosenthal order desk which transmitted the information to the appropriate exchange floor where it was executed by a floor broker. As an account executive, petitioner received a percentage of gross commissions generated on trades executed on behalf of and for the account of customers.

Throughout the 1980-81 period, petitioner had about 8-12 customers, mostly friends and family. These included his brother-in-law, Jeffrey Bender; his father, Isidore Kovner; his accountant, Elliot Goldberg; as well as individual accounts for his business associates Michael Appell and Harvey Klaris. Petitioner made the investment decisions for these accounts.

Petitioner placed orders for contracts listed on most U.S. exchanges designated as contract markets by the CFTC. During 1980-81, petitioner placed orders for regulated futures contracts virtually every day. He was engaged approximately 50-60 hours per week in placing orders for commodities, monitoring commodities markets, and providing related advice to customers.

### 3. *Kovner Associates and Comart*

In 1980, petitioner formed Kovner Associates, Inc., to invest in commodities for himself and others. In 1981, the corporation's name was changed to Comart, Inc. Comart sought to match clients with commodities brokers best suited to their needs.

Although the tax years at issue here are 1980 and 1981, we note that in 1983 Comart became an introducing broker with the CFTC. An introducing broker is any person who, for compensation or profit, solicits or accepts orders for the purchase or sale of any commodity for future delivery subject to the rules of any contract market and who does *not* accept money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result therefrom. An introducing broker does not include a futures commission merchant, floor broker, or associated person acting in its capacity as such. 17 C.F.R. sec. 1.3(mm). Comart was also a member of the National Futures Association.

## 4. *Petitioners' Commodities Accounts*

Petitioners had three separate investment accounts. The sole name on the first account was petitioner's wife, Joyce Kovner. Upon inception, this account had approximately $20,000 in equity. As the market fluctuated, the equity ranged between $6,064 and $66,599. Petitioner made the investment decisions for this account.

The sole name on the second account was also Joyce Kovner. Petitioner's brother, Bruce Kovner, made the investment decisions for that account under a power of attorney. The equity in this account ranged from $115,000 to $140,000.

The third account was held by MNA Commodities Investors (MNA). MNA was a partnership engaged in buying and selling commodities of which petitioner was the managing partner. Petitioners invested $50,000 of the initial $165,000 total capital invested in MNA, and the other partners contributed the balance. Petitioner made the investment decisions for this account, placed the orders, and managed the partnership.

Petitioners had approximately $171,000 to $266,000 of their own funds in commodities markets during 1980 and 1981. This represented a substantial part of their net worth at that time. During this time, petitioner received most of his earnings from commodities transactions.

## 5. *Summary of Petitioners' Commodities Accounts*

Petitioners' accounts are summarized below:

| Account | Account amount (Equity range) | | Did petitioner make investment account decisions for the account? |
|---|---|---|---|
| Rosenthal—Joyce Kovner | $6,000 | $66,600 | yes |
| Cargill—Joyce Kovner | 115,000 | 140,000 | no |
| Cargill—MNA | 50,000 | [1]59,400 | yes |
| Total | 171,000 | 266,000 | |

[1] This amount was derived by subtracting the amounts invested in the first and second accounts from the total funds invested.

## DISCUSSION

The sole issue for decision is whether petitioner is a "commodities dealer in the trading of commodities" within the meaning of section 108(b) of the Deficit Reduction Act of 1984, as amended by the Tax Reform Act of 1986.

### 1. *Background*

In 1981, Congress was concerned about the rapid growth in use of commodities spreads and straddles as a tax shelter. The Ways and Means Committee Report for the Tax Incentive Act of 1981, which was their report for the bill that later became the Economic Recovery Tax Act of 1981 (ERTA), states in pertinent part:

> The committee is concerned about the rapidly increasing use of transactions in commodity-related property to shelter unrelated income from taxation. Such shelters, usually structured as straddles or spreads, have been used by both individual and corporate taxpayers to defer income and frequently to convert ordinary income or short-term capital gain into long-term capital gain. These shelters have been widely publicized, promoted by brokerage firms and offered as limited partnership interests in domestic and off-shore syndicates. The growth of these shelters threatens to undermine the integrity of the United States' voluntary tax-assessment system and to create substantial revenue losses. [H. Rept. 97-201, at 198 (1981).]

In a similar vein, the Senate Finance Committee Report for ERTA states that:

> In the last ten to fifteen years, the use of * * * tax shelters in commodity futures has extended beyond investment professionals to significant numbers of taxpayers, individual and corporate, throughout the economy. The tax advantages of spread transactions, especially those structured in commodity futures contracts, have been touted in commodity manuals, tax services and financial journals. Brokerage firms have promoted tax spreads or straddles to their clients. Domestic and offshore syndicates have advertised tax straddle shelters for which purchasers pay a fee in an amount equal to a percentage of their desired tax loss. [S. Rept. 97-144, at 146 (1981).]

As a result of these concerns, Title V of ERTA, Pub. L. 97-34, 95 Stat. 172, contained provisions to prevent the deferral of income and conversion of ordinary income and short-term capital gain into long-term capital gain through commodities transactions.

The 1981 commodities straddles provisions did not provide rules for disposition of pre-ERTA straddles cases then before the Internal Revenue Service. In 1984, the Senate Finance Committee believed that there were too many of these cases still remaining at the Internal Revenue Service. Its version of the Deficit Reduction Act of 1984 included a provision to require the Secretary of the Treasury to report to the tax-writing committees of Congress on the status of those cases. H. Rept. 98-861 (Conf.), at 917 (1984), 1984-3 C.B. (Vol. 2) 171. The conference agreement substituted a provision intended to reduce the number of remaining pre-1982 cases. Sec. 108; H. Rept. 98-861 (Conf.), *supra.*

### 2. *Deficit Reduction Act of 1984—Section 108*

Section 108(a) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 630, generally permitted the deductibility of losses incurred on the disposition of one or more positions entered into before 1982 and which form part of a straddle, if the position was part of a transaction entered into for profit. Section 108(b) of the Deficit Reduction Act of 1984, as applied to commodities dealers and persons regularly engaged in investing in regulated futures contracts, created a rebuttable presumption that the transaction was entered into for profit.

For the text of section 108(a), (b), and (f), and the related text of the Conference Report to the Deficit Reduction Act of 1984, H. Rept. 98-861 (Conf.)(1984), 1984-1 C.B. (Vol. 2) 1, see appendices A and B.

### 3. *Tax Reform Act of 1986*

The Tax Reform Act of 1986 made technical corrections to section 108. Sec. 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514. The 1986 amendments limited section 108(b) to commodities dealers in the trading of commodities. The 1986 act also eliminated the rebuttable presumption and substituted a per se rule that any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business. For the text of the Tax Reform Act of 1986 amendments to section 108(a) and (b), see appendix C.

It appears that the intent in amending section 108 in 1986 continued to be to provide a rule to reduce the number of pre-ERTA straddles cases at the Internal Revenue Service. The Conference Report for the Tax Reform Act of 1986 states that:

the conferees clarify their intent that the Internal Revenue Service bring all outstanding pre-ERTA straddle litigation to a speedy resolution, so that the large docket of cases on this issue may be cleared in a manner consistent with this legislation. [H. Rept. 99-841 (Conf.) at II-845 (1986), 1986-3 C.B. (Vol. 4) 845.]

For the text of the House Ways and Means Committee Report, H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, and the Conference Report to the Tax Reform Act of 1986, H. Rept. 99-841 (Conf.) (1986), 1986-3 C.B. (Vol. 4) 1, see appendix D.

The 1984 and 1986 versions of section 108(a) and (b) are compared below:

| *Deficit Reduction of 1984* | *Tax Reform Act of 1986* |
|---|---|
| SECTION 108 | |
| (a) any loss from such disposition shall be allowed for the taxable year of the disposition * * * | |
| * * *if such position is part of a transaction entered into for profit | * * * if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. |
| (b) *Presumption That Transaction—* Entered Into for Profit— | (b) *Loss Incurred in a* Trade or Business— |
| For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit. | For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business. |

## 4. *Commodities Dealer in the Trading of Commodities*

As stated, the 1986 act limited section 108(b) to a "commodities dealer in the trading of commodities." We will next discuss the definition of commodities dealer for purposes of section 108.

Section 108(f) refers to a definition of commodities dealer used for the self-employment tax provisions. Sec. 1402(i)(2)(B).

Under section 1402(i)(2)(B), a commodities dealer is any person who is (a) actively engaged in trading section 1256 contracts, and (b) registered with a domestic board of trade designated as a contract market by the Commodities Futures Trading Commission. Sec. 1402(i)(2)(B). Section 1256 contracts include "any regulated futures contract." Secs. 1402(i)(2)(C), 1256(b)(1). To be eligible under section 108(b), petitioner must satisfy both tests.[2]

### a. *Actively Engaged in Trading Section 1256 Contracts*

Respondent's position is that petitioner's activities as a commodities broker and investor do not constitute the "trading" of section 1256 contracts. Respondent contends that petitioner was not actively engaged in trading futures contracts because he was not a floor trader, floor broker, or member of an exchange, and he did not execute trades on the floor of a domestic exchange designated as a contract

---

[2]This opinion decides whether an individual who is an associated person (AP) and investor is eligible per se to deduct commodities losses under sec. 108(b). As noted, sec. 108 refers to the definition of commodities dealer used for the self-employment tax provisions, sec. 1402(i)(2)(B).

The sec. 1402(i)(2)(B) definition of commodities dealer was made part of the Internal Revenue Code by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 102(c), 98 Stat. 622. Its role in the self-employment tax scheme is as follows: Secs. 1401-1403 impose a tax on self-employment income. The tax on self-employment income applies to net earnings from an individual's trade or business. Sec. 1402(a). However, it generally does not apply to gain or loss from the sale or exchange of a capital asset. Sec. 1402(a)(3)(A).

Sec. 1402(i) is an exception to sec. 1402(a)(3)(A) for certain dealings by commodities and options dealers. It provides that, in determining net self-employment earnings of an options or commodities dealer, "any gain or loss (in the normal course of the taxpayer's activity of dealing in or trading section 1256 contracts) from section 1256 contracts" or related property shall not be excluded. Sec. 1402(i). Sec. 1402(i)(2)(B) defines commodities dealer.

Thus, under sec. 1402(i), commodities dealers take into account gains or losses for self-employment tax purposes that would otherwise be disregarded by sec. 1402(a)(3)(A).

We note that an opinion dealing with AP's has little or no practical effect for self-employment tax purposes because AP's are usually employees, 7 U.S.C. sec. 6k (1982), 17 C.F.R. secs. 1.3(aa) and 3.12(a)-(c) (1982); 1 P. Johnson, Commodities Regulation, 118, 122 (1st ed. 1982), and, thus, would not usually come within the self-employment tax. In contrast, floor brokers historically have been self-employed. P. Johnson, *supra* at 123.

market by the CFTC. Respondent argues that petitioner should only be deemed to be trading futures contracts if he is a member of, or owns a seat on, the exchange on which such contracts are traded.

Petitioner concedes that he was not a floor trader, floor broker, or member of a commodities exchange, but he maintains that he was actively engaged in "trading" regulated futures contracts (RFC's) in 1980 and 1981 as an investor and for customers.

This is a case of first impression in that we have not previously decided whether an associated person qualifies as a "commodities dealer in the trading of commodities" under section 108(b), as amended. But we note that in two other cases in which we considered the applicability of section 108(b) of the Deficit Reduction Act of 1984, the parties agreed that the taxpayer, who was a member of a domestic exchange, was a commodities dealer. *King v. Commissioner,* 87 T.C. 1213 (1986); *Perlin v. Commissioner,* 86 T.C. 388 (1986).

In *King v. Commissioner, supra* at 1218-1219, the taxpayer was a member of the CME and its division, the International Monetary Market. We held that the taxpayer was eligible for section 108(b).

In *Perlin v. Commissioner, supra,* the taxpayer was a member of the CBOT who traded commodities futures contracts as a floor trader. In discussing Perlin's status as a member of the exchange, this Court distinguished professional traders who are members of an exchange from investors who are not members of an exchange and who invest through a broker. We said, "In this opinion, we will be using the term 'trader' to refer to a professional commodities trader who is a member of the CBOT. In contrast, we will use the term 'investor' to refer to a person who is not a member of the CBOT, but invests in commodity futures through the use of a broker." *Perlin v. Commissioner, supra* at 390 n. 5. Our decision here is consistent with the cited terminology from *King* and *Perlin.*[3]

---

[3]We note that CFTC regulations appear to use the term "traders" to include investors. For purposes of the CFTC's reportable position regulations, 17 C.F.R. secs. 15 through 19.10, a trader is a person who, for his own account or for an account which he controls, makes transactions in commodity futures or options, or has such transactions made. 17 C.F.R. sec.

Even where the statutory language appears clear on its face, a court may seek out any reliable evidence as to legislative purpose. *United States v. American Trucking Associations,* 310 U.S. 534, 543-544 (1940); see *United States v. Dickerson,* 310 U.S. 554, 562 (1940); *Huntsberry v. Commissioner,* 83 T.C. 742, 747 (1984); *Carasso v. Commissioner,* 34 T.C. 1139, 1142 (1960), affd. 292 F.2d 367 (2d Cir. 1961).

We next turn to an examination of the legislative history of section 108(b).

We recognize that petitioner was engaged full-time in commodities transactions. However, this does not necessarily make him eligible to deduct losses under section 108(b).

In its report for what became the Tax Reform Act of 1986, the House Ways and Means Committee stated that the deductibility of losses by a commodities dealer eligible for section 108(b) is not interchangeable with the deductibility of losses in a trade or business under section 162. The report stated that the treatment of an individual as a commodities dealer as defined in section 108(b) is only for purposes of section 108(a), and "no inference should be drawn that a loss is incurred in a trade or business for any other purpose, such as for purposes of section 162." H. Rept. 99-426, at 911 (1985), 1986-3 C.B. (Vol. 2) 911.

The Conference Report for the Deficit Reduction Act of 1984 states: "A commodity dealer is any person registered with a domestic board of trade designated as a contract market by the CFTC who buys or sells options or RFC's subject to the rules of such board." H. Rept. 98-861 (Conf.), at 910 (1984), 1984-3 C.B. (Vol. 2) 164.

We believe this language was intended to exclude associated persons (such as petitioner) from the definition of commodities dealer. Associated persons solicit and accept customer orders, 17 C.F.R. sec. 1.3(aa) (1981); in contrast, floor brokers buy and sell commodities subject to the rules of the exchange, 17 C.F.R. sec. 1.3(n) (1981); and floor

15.00(e). Investors appear to meet this definition, but were specifically excluded from the definition of commodities dealer by the 1986 TRA amendments to sec. 108(b).

There is also apparently use in the commodities field of the term "trader" to include investors. See, e.g., M. Powers, Getting Started in Commodity Futures Trading 1-14 (4th ed. 1983); and M. Powers and D. Vogel, *supra* at 22. In light of the deletion of investors from sec. 108(b) by the 1986 TRA, it is clear that all those that may be popularly referred to as commodities traders are not eligible for sec. 108(b).

traders are exchange members by or for whom futures trades are executed, 17 C.F.R. sec. 1.3(x) (1982).

The House Report to the Tax Reform Act of 1986 provides that section 108(b) will not apply in cases "where the trades were * * * otherwise in violation of the rules of the exchange in which the dealer is a member." H. Rept. 99-426, at 911 (1985), 1986-3 C.B. (Vol. 2) 911. The Conference Report similarly states that if a person qualifies as a commodities dealer, section 108(b) treatment will apply to any position disposed of by such person whether or not such position "was traded on an exchange on which the dealer was a member." H. Rept. 99-841 (Conf.), at II-845 (1986), 1986-3 C.B. (Vol. 4) 845. This language from both the House and Conference Reports presumes that a person eligible for section 108(b) is a member of an exchange, unlike petitioner.

As originally enacted in 1984, section 108(b) applied to commodities dealers and to any person regularly engaged in investing in regulated futures contracts. Eligible persons were given a presumption of profit motive. The 1986 act changed the presumption to provide a per se rule that losses incurred by a commodities dealer on trades entered in compliance with the rules of the exchange are treated as losses incurred in a trade or business. See *King v. Commissioner*, 87 T.C. 1213, 1218-1219 (1986). This avoids the need to determine profit motive to resolve eligibility for section 108(b). At the same time, eligibility for section 108(b) was narrowed to commodities dealers in the trading of commodities. We believe petitioners' position on this issue fails to recognize—and could largely negate—the narrowing of eligibility for section 108(b) under the 1986 amendments.

The Conference Report to the Tax Reform Act of 1986 states that "if an individual owns a seat on a commodities exchange, such individual will be treated as a 'commodities dealer.'" H. Rept. 99-841 (Conf.), at II-845 (1986), 1986-3 C.B. (Vol. 4) 845.

This language establishes that an individual who owns a seat on (i.e., is a member of) an exchange is a commodities dealer under section 108(b). However, beyond that, the parties dispute its meaning. Respondent reads it to limit section 108(b) to members of an exchange. Petitioners read

it to merely make a category of persons automatically eligible for section 108(b). Even if we agreed with petitioners' view, the cited language itself does not go as far as petitioners need; it does not purport to extend section 108(b) to brokers or investors, and we do not see support for that position elsewhere in the statute or legislative history. Deductions are a matter of legislative grace and are construed narrowly. *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148-149 (1974); *Deputy v. duPont,* 308 U.S. 488, 493 (1940); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440 (1934).

In view of the foregoing, we hold that, under the 1986 amendments, section 108(b) excludes brokers and investors who are not floor traders, floor brokers, or members of an exchange. Petitioner, as a commodities investor and broker, and as an AP or registered commodity representative (RCR), is not a "commodities dealer in the trading of commodities" for purposes of section 108(b) since he does not buy and sell commodities futures on the floor of, and subject to the rules of, an exchange. In so deciding, we do not necessarily limit eligibility for section 108(b) to owners of seats on an exchange; however, we do decide that AP's are excluded from section 108(b).

### b. *Registered With a Domestic Board of Trade*

Section 1402(i)(2)(B) requires that a commodities dealer be "registered" with a domestic board of trade designated as a contract market by the CFTC. Petitioner contends that because he was registered both as an AP under the CFTC regulations and an RCR with the Chicago Board of Trade he comes within section 108(b). In contrast, respondent argues that petitioner was not registered during 1980 since he was not registered as a member of an exchange.

Neither the statute nor the rules of the CBOT defines "registered." The CFTC regulations, however, acknowledge several types of registration. 17 C.F.R. secs. 1.3(aa)-(cc), (mm) (1985). For example, several types of persons are required to register with the CFTC: an associated person, commodity trading adviser, commodity pool operator, and an introducing broker. Several types of persons are required to be registered with the CBOT as well: members, member-

ship interest holders, RCR's, floor clerks, and broker's assistants.

Having held above that petitioner was not actively engaged in trading section 1256 contracts, resolution of this issue will not affect petitioner's eligibility for section 108(b), and so we do not reach it.

This opinion decides petitioner's eligibility for section 108(b). Further proceedings will be required to dispose of other open issues in the case.

To reflect the foregoing,

*An appropriate order will be issued.*

Reviewed by the Court.

NIMS, CHABOT, PARKER, KÖRNER, SHIELDS, HAMBLEN, JACOBS, GERBER, WRIGHT, PARR, and WELLS, *JJ.*, agree with the majority.

SWIFT and RUWE, *JJ.*, did not participate in the consideration of this opinion.

---

APPENDIX A

DEFICIT REDUCTION ACT OF 1984—STATUTORY PROVISIONS

Section 108(a), (b), and (f) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 630-631, provides—

SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY ACT OF 1981.

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit.

(b) PRESUMPTION THAT TRANSACTION ENTERED INTO FOR PROFIT.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(f) COMMODITIES DEALER.—For purposes of this section, the term "commodities dealer" has the meaning given to such term by section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle).

---

## APPENDIX B

### DEFICIT REDUCTION ACT OF 1984—COMMITTEE REPORTS

The House version of the Deficit Reduction Act of 1984 (H.R. 4170, H. Rept. 98-432 and 98-432, Pt. 2) contained no provisions regarding the treatment of losses from pre-1982 straddles. The Senate amendment required the Secretary to report to the Senate Finance and House Ways and Means Committees with respect to progress made in reducing the backlog of cases involving the pre-ERTA treatment of RFC's. S. Prt. 98-169 (Vol. II), sec. 839 (1984).

In lieu of the Senate amendment's requirement of a report, the conference agreement included section 108 of the 1984 act, a noncode provision which specifically addressed pre-1982 straddles.

The Conference Report to the Deficit Reduction Act of 1984, H. Rept. 98-861 (Conf.), at 917 (1984), 1984-3 C.B. (Vol. 2) 171, states:

In the case of commodity dealers and persons actively engaged in investing in RFCs, the provision is to be applied by presuming that the position is held as part of a transaction entered into for profit unless the Internal Revenue Service establishes to the contrary. In determining whether a taxpayer is actively engaged in trading in RFCs with an intent to make a profit, a significant factor will be the extent of transaction costs. If they are sufficiently high relatively to the scope of the taxpayer's activities that there is no reasonable possibility of a profit, the presumption will be unavailable. RFCs for purposes of applying the presumption are regulated futures contracts as defined in section 1256(b) before its amendment by the bill.

For purposes of the provision, the term "commodities dealer" has the same meaning as such term in the amendments by the bill providing for application the self-employment income tax to such persons.

As defined in the 1984 Conference Report, H. Rept. 98-861 (Conf.), at 910 (1984), 1984-3 C.B. (Vol. 2) 164:

A commodity dealer is any person registered with a domestic board of trade designated as a contract market by the CFTC who buys or sells options or RFCs subject to the rules of such board. * * * The conferees intend that no inference be made as to whether options dealers and commodity dealers be viewed as engaged in a trade or business in connection with their transactions in section 1256 contracts as a result of the application of self-employment taxes to such persons.

---

## APPENDIX C

### TAX REFORM ACT OF 1986—STATUTORY PROVISIONS

As amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817, section 108(a) and (b) provides:

SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY ACT OF 1981.

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

(b) LOSS INCURRED IN A TRADE OR BUSINESS.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.

\*     \*     \*     \*     \*     \*     \*

(f) COMMODITIES DEALER.—For purposes of this section, the term "commodities dealer" means any taxpayer who—

(1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), or

(2) was a member of the family (within the meaning of section 704(e)(3) of such Code) of an individual described in paragraph (1) to the extent such member engaged in commodities trading through an organization the members of which consisted solely of—

(A) 1 or more individuals described in paragraph (1), and

(B) 1 or more members of the families (as so defined) of such individuals.

## APPENDIX D

## TAX REFORM ACT OF 1986—COMMITTEE REPORTS

Regarding the treatment of losses from pre-ERTA straddles, the House Ways and Means Committee Report, H. Rept. 99-426, at 910-911 (1985), 1986-3 C.B. (Vol. 2) 910-911, for the bill that became the Tax Reform Act of 1986, states:

*Present Law*

Unlike taxpayers who conducted isolated straddle transactions prior to the effective date of ERTA solely for tax purposes, taxpayers in the trade or business of trading commodities conducted numerous straddle transactions in the normal course of their business. Section 108 was intended to clarify the treatment of losses claimed with respect to straddle positions entered into and disposed of prior to 1982 by taxpayers in the trade or business of trading commodities. It provided a profit-motive presumption in section 108(b) for such taxpayers because of the inherent difficulty in distinguishing tax-motivated straddle transactions from profit-motivated straddle transactions when the taxpayer was in the trade or business of trading in commodities.

*Explanation of Provision*

The bill makes clear that [sec. 108] subsection (b) treatment is limited to those taxpayers in the business of trading commodities. The determination of whether a taxpayer is in the business of trading commodities is based upon all the relevant facts and circumstances. Under the statute as clarified by the technical correction, generally a taxpayer engaged in the business of investment banking who regularly trades in commodities as a part of that business would be considered in the trade or business of trading commodities. If a person qualifies as a commodities dealer, the subsection (b) treatment applies with respect to any position disposed of by such person. It would, for example, apply without regard to whether the position was in a commodity regularly traded by the person, whether it was traded on an exchange on which the dealer was a member, or whether an identical position was re-established on the same trading day or subsequently.

\*      \*      \*      \*      \*      \*      \*

A taxpayer who does not satisfy the indicia of trade or business status, such as the taxpayer in *Miller v. Commissioner* (84 T.C. No. 55 (1985)), would not be considered in the trade or business of trading commodities. Further, the presumption would not be available in any cases where the

trades were fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member. The subsection (b) treatment is only for purposes of subsection (a), and no inference should be drawn that a loss is incurred in a trade or business for any other purpose, such as for purposes of section 162, 163(d) or 172.

The Senate version of the Tax Reform Act of 1986 did not amend section 108.

The Conference Report to the Tax Reform Act of 1986, H. Rept. 99-841 (Conf.), at II-845 (1986), 1986-3 C.B. (Vol. 4) 845, states:

The conference agreement follows the House bill. Under the statute as clarified by the technical correction, generally a taxpayer engaged in the business of investment banking who regularly trades in commodities as a part of that business would be considered in the trade or business of trading commodities. If a person qualifies as a commodities dealer, the subsection (b) treatment applies with respect to any position disposed of by such person. It would, for example, apply without regard to whether the position was in a commodity regularly traded by the person, whether it was traded on an exchange on which the dealer was a member, or whether an identical position was re-established on the same trading day or subsequently. The conferees also wish to clarify that if an individual owns a seat on a commodities exchange, such individual will be treated as a "commodities dealer." Further, if a trading firm also regularly trades commodities in connection with its business, then the commodities trading will be deemed to be part of its trade or business. The latter rule applies only to the securities trading firm itself; it does not apply to separate individual trading of its partners, principals, or employees, nor to partnerships or other organizations formed for the principal purpose of marketing tax straddles.

*　　*　　*　　*　　*　　*　　*

Further, the conferees clarify their intent that the Internal Revenue Service bring all outstanding pre-ERTA straddle litigation to a speedy resolution, so that the large docket of cases on this issue may be cleared, in a manner consistent with this legislation.

---

WHALEN, *J.*, dissenting: We are again confronted with section 108 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 630 (hereinafter section 108). In this case, we are called upon to decide whether petitioner qualifies as a "commodities dealer" within the meaning of section 108(b)

as amended by section 1808(d), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817.

The majority construes the term "commodities dealer" to exclude everyone other than floor traders, floor brokers, and members of an exchange. In my view, there is no basis for such limitation in the statute or its legislative history. The majority arrives at this narrow construction by focusing on section 108(b), a provision of limited applicability intended to allow a deduction for certain pre-1982 straddle losses. The majority appears to overlook or dismiss as having "little or no practical effect" the impact of its opinion on the application of the self-employment tax to commodities traders and on their ability to contribute to qualified self-employment plans. (Majority op. at 902 note 2.) By limiting the term "commodities dealers" to floor traders, floor brokers, and members of an exchange, the majority limits the application of self-employment taxes to the same group. Other commodities traders escape self-employment tax on the gains and losses realized from their trading of section 1256 contracts. Similarly, they are not entitled to treat such gains and losses as "earned income" under the rules governing contributions to self-employment plans. See sec. 401(c)(2). I cannot accept the majority's view that Congress intended this anomalous result or that we should disregard it as having "little or no practical effect."

In general, section 108(b) treats losses from certain pre-1982 straddles as "incurred in a trade or business" and, thus, as losses deductible under section 108(a). The losses which qualify for such treatment are those incurred by a "commodities dealer in the trading of commodities."

For purposes of section 108(b), the term "commodities dealer" is defined by section 108(f) to mean "an individual described in section 1402(i)(2)(B)" and certain members of his family. Section 1402(i)(2)(B) provides as follows:

(B) COMMODITIES DEALER.—The term "commodities dealer" means a person who is actively engaged in trading section 1256 contracts and is registered with a domestic board of trade which is designated as a contract market by the Commodity Futures Trading Commission.

Respondent's position is that the above definition prescribes a two-part test. First, he contends that "the term 'registered' as used in section 1402(i)(2)(B) was intended to

mean registered as a *member*." (Emphasis supplied.) Second, he contends, "In determining whether the petitioner 'actively engaged in trading section 1256 contracts,' the Court must look only to the trades *personally executed* by him on the floor of a domestic exchange designated as a contract market by the CFTC." (Emphasis supplied.) Respondent's position is that only a member of an exchange who personally executes sufficient trades on the floor of a domestic exchange (or, alternatively, has them executed for his own account) is a "commodities dealer," as that term is used in section 108(b). Respondent argues, "Congress intended section 108(b) to give preferential treatment only to professional traders that operated on the floor of an exchange."

The majority accepts respondent's construction of the "actively engaged" requirement. It construes the phrase "actively engaged in trading section 1256 contracts" to exclude persons "who are not floor traders, floor brokers or members of an exchange." (Majority op. at 906.) As I read its opinion, if a taxpayer does not fall into one of those narrow categories, he is not a "commodities dealer," regardless of the manner in which he engages in commodities trading or the volume of such activity. Petitioner concededly does not fall within those categories. Therefore, the majority holds that petitioner is not a "commodities dealer" because "he does not buy and sell commodities futures on the floor of, and subject to the rules of, an exchange." (Majority op. at 906.) In view of that holding, the majority does not construe the term "registered" or reach respondent's contention that such term in section 1402(i)(2)(B) means membership on an exchange.

Unlike the majority, I believe that qualification under the words "actively engaged in trading section 1256 contracts" was intended to be determined using the facts and circumstances analysis which we have traditionally employed in such cases. See, e.g., *King v. Commissioner*, 89 T.C. 445 (1987); *Liang v. Commissioner*, 23 T.C. 1040 (1955); *Polacheck v. Commissioner*, 22 T.C. 858 (1954); *Kemon v. Commissioner*, 16 T.C. 1026 (1951). Under that analysis, the location at which a person buys and sells securities or commodities contracts, and his membership on an exchange,

are factors which may be taken into account, but they are not determinative of the taxpayer's status as a trader, broker, or investor. For example, in *King v. Commissioner, supra* 457 et seq., we distinguished traders from dealers and investors by the nature and extent of their activities. In that case, the Court noted that persons who regularly buy and sell on an exchange may be either dealers or traders. The difference between the two is that dealers have customers, whereas traders do not. Accordingly, the stocks or commodity contracts held by a trader in his business may qualify as capital assets under the definition in section 1221. *King v. Commissioner, supra* at 457. Thus, traders occupy an unusual position under the tax law because they may engage in a trade or business which produces capital gains and losses, rather than ordinary income and losses. *King v. Commissioner, supra* at 457. Traders are distinguished from investors by the nature of the activity in which they are engaged. Traders seek to profit from short-term market swings and receive income principally from selling rather than from dividends, interest, or long-term appreciation. Trading, as compared to investing, implies more frequent and substantial purchases and sales. *King v. Commissioner, supra* at 458.

Significantly, the Deficit Reduction Act of 1984 added section 1256(f)(3) to provide that, with the exception of certain hedging transactions, gains and losses "from trading of section 1256 contracts" are to be treated as capital gains and losses. The conference report accompanying the act notes that Congress merely intended to codify prior law "with respect to professional commodity traders." H. Rept. 98-861 (Conf.), at 903 (1984), 1984-3 C.B. (Vol. 2) 157. The conference report in effect recognized that traders occupy a special position under the tax law, as summarized above.

Congress also enacted section 1402(i) in the Deficit Reduction Act of 1984 and further recognized that the capital gains and losses realized by a commodities trader "in the normal course of the taxpayer's activity of * * * trading section 1256 contracts" are, in reality, business income which should be subject to self-employment tax and taken into account in making contributions to self-employment plans. Congress defined the term "commodities

dealers" in section 1402(i)(2)(B) to describe the group who would be treated as professional commodities traders and subject to self-employment tax on their gains and losses from trading. That is, persons who are "actively engaged in trading section 1256 contracts" and who are "registered with a domestic board of trade."

The words "actively engaged in trading" are meant to identify "traders," as determined under the facts and circumstances analysis described above. Thus, in my view, the definition of commodities dealer in section 1402(i)(2)(B) is intended to include traders who, like petitioner, are registered with a domestic exchange. The definition was intended to exclude investors and traders who, unlike petitioner, are not registered with a domestic exchange.

In any event, there is nothing to suggest that Congress intended the term "commodities dealer" to refer only to floor traders, floor brokers, or members of an exchange. If Congress had wanted to limit the definition of commodities dealer to floor brokers, floor traders, and members of an exchange, it could have simply used those words, rather than the phrase "actively engaged in trading section 1256 contracts." It has done so in other similar provisions. For example, in section 1236(d)(2) Congress specifically defined the term "floor specialist" as follows:

(2) FLOOR SPECIALIST.—The term "floor specialist" means a person who is—

    (A) a member of a national securities exchange,
    (B) is registered as a specialist with the exchange, and
    (C) meets the requirements for specialists established by the Securities and Exchange Commission.

Although the majority sets forth its view that Congress intended to limit the definition of "commodities dealer" to floor traders, floor brokers, and members of an exchange, it never explains how the words "actively engaged in trading section 1256 contracts" convey that intent. Implicit in the majority opinion is the proposition that only floor traders, floor brokers, and members engage in "trading" commodities futures contracts. Also implicit is the proposition that only floor traders, floor brokers, and members can be "actively engaged" in such activity. I cannot accept either proposition.

Indeed, respondent's own regulation defining the term "commodities dealer" in section 1402(i)(2)(B) does not limit it to floor traders, floor brokers, and members of an exchange. That regulation states as follows:

Q-7. Who qualifies as a commodities dealer or as a person regularly engaged in investing in regulated futures contracts for purposes of the profit presumption?

A-7. For purposes of this section, the term "commodities dealer" has the meaning given to such term by section 1402(i)(2)(B) of the Code. Section 1402(i)(2)(B) defines a commodities dealer as a person who is actively engaged in trading section 1256 contracts (which includes regulated futures contracts as defined in Q&A-6) and is registered with a domestic board of trade which is designated as a contract market by the Commodity Futures Trading Commission. To determine if a person is regularly engaged in investing in regulated futures contracts all the facts and circumstances should be considered including, but not limited to, the following factors: (1) regularity of trading at all times throughout the year; (2) the level of transaction costs; (3) substantial volume and economic consequences of trading at all times through the year; (4) percentage of time dedicated to commodity trading activities as compared to other activities; and (5) the person's knowledge of the regulated futures contract market. [Sec. 1.165-13T, Temporary Income Tax Regs., 49 Fed. Reg. 33445 (Aug. 23, 1984).]

The majority appears to base its narrow construction of the term "commodities dealer" solely on the legislative history of section 108. Although the majority admits that the "actively engaged in trading" requirement "appears clear on its face," it nevertheless undertakes an examination of the legislative history of section 108(b) on the ground that the Court "may seek out any reliable evidence as to legislative purpose." (Majority op. at 904.) While I agree that the Court can look to clear legislative history to construe the terms of an ambiguous statute, the majority appears to do the opposite. The legislative history cited by the majority is anything but clear, and thus the majority appears to rely upon ambiguous legislative history to vary the terms of a clear statute. Moreover, the majority appears to focus on the legislative history of section 108(b) and, in the process, loses sight of the broader implications of the term "commodities dealers" contained in section 1402(i).

My principal objection is that the majority's narrow definition of the term "commodities dealer" for purposes of section 108 does not comport with the intended use of that

term for self-employment tax purposes. In fact, as mentioned above, the definition at issue here is drawn from a self-employment tax provision, section 1402(i)(2)(B). It was enacted by the Deficit Reduction Act of 1984 as part of a special rule to prescribe how commodities dealers are to compute "net earnings from self-employment" for purposes of the self-employment income tax under section 1401. Generally, taxpayers other than commodities dealers exclude capital gains and losses in determining net earnings from self-employment. Sec. 1402(a)(3)(A). Commodities dealers, on the other hand, are required by the special rule to take into account gains or losses "from section 1256 contracts or property related to such contracts." Sec. 1402(i)(1).

In enacting this provision, Congress also intended that commodities dealers would thereby be entitled to treat gains and losses from their trading activity as "earned income" for purposes of section 401(c)(2) and the rules governing contributions to self-employment plans. H. Rept. 98-861, at 910 (1984), 1984-3 C.B. (Vol. 2) 164. Congress made a similar change to the Social Security Act. See sec. 102(c)(2), Deficit Reduction Act of 1984, 98 Stat. 622.

The definition of "commodities dealer" is the same under section 108 as it is under section 1402(i)(2)(B). Congress intended it to be the same:

> For purposes of the provision [section 108], the term "commodities dealer" has the same meaning as such term in the amendments by the bill providing for application [of] the self-employment income tax to such persons. [H. Rept. 98-861, at 917 (1984), 1984-3 C.B. (Vol. 2) 171.]

Thus, the majority's construction of the term for purposes of section 108 governs for self-employment tax purposes. If, as the majority holds, only floor traders, floor brokers, or members of an exchange are "commodities dealers" for purposes of section 108, then only such persons are commodities dealers for purposes of section 1402(i)(2)(B). Other commodities traders are not "commodities dealers," and are not subject to the special rule of section 1402(i). They need not include their gains and losses realized from trading futures contracts and underlying property in computing net earnings from self-employment. Sec. 1402(a)(3)(A). Therefore, under the majority's construction of

the "actively engaged" requirement of section 1402(i)(2)(B), only floor traders, floor brokers, and members of an exchange are subject to self-employment tax on their business income.

I see no reasonable basis to suppose that Congress intended to impose self-employment taxes on floor traders, floor brokers, and members of an exchange, but to allow other professional commodities traders to escape self-employment taxes. In defining the term "commodities dealer," section 1402(i)(2)(B) says nothing about the physical location at which a taxpayer conducts his trading activity or whether the person is a member of an exchange. The gains and losses which he realizes from his trading activity are the same whether he conducts his activity on the floor of the exchange or elsewhere. They receive the same characterization, as capital or ordinary, regardless whether the trading takes place on or off the floor of an exchange. See, e.g., sec. 1256(f)(3).

Similarly, the legislative history of section 1402(i)(2)(B) says nothing about the physical location of a taxpayer's trading. Congress described its definition of "commodities dealer" in section 1402(i)(2)(B) as follows:

Under the conference agreement, gains and losses derived in the ordinary course of trading in section 1256 contracts and property related to such contracts (e.g., stock used to hedge options) are defined as earnings from self-employment for purposes of applying the tax on self-employment income and the rules relating to contributions to self-employment plans. This treatment is extended only to options dealers, and commodity dealers, as defined in the bill. A commodity dealer is any person registered with a domestic board of trade designated as a contract market by the CFTC who buys or sells options or RFCs subject to the rules of such board. This treatment applies to taxable years beginning after the date of enactment except that for options dealers electing 60/40 and mark-to-market rules for the taxable year which includes the date of enactment, it applies for such taxable year. The conferees intend that no inference be made as to whether options dealers and commodity dealers be viewed as engaged in a trade or business in connection with their transactions in section 1256 contracts as a result of the application of self-employment taxes to such persons. [H. Rept. 98-861, at 910 (1984), 1984-3 C.B. (Vol. 2) 164.]

The majority's narrow construction of "commodities dealer" creates the anomalous result that only floor traders, floor brokers, and members of an exchange are subject to

self-employment tax on gains and losses from trading section 1256 contracts. This problem cannot be dismissed, as the majority attempts to do in footnote 2 of its opinion, on the ground that its opinion deals with "associated persons" and has "little or no practical effect for self-employment tax purposes because AP's are usually employees." (Majority op. at 902 note 2.) The majority's holding is not limited to associated persons and investors. Its opinion states "we hold that, under the 1986 amendments, section 108(b) excludes brokers and investors who are not floor traders, floor brokers, or members of an exchange." (Majority opinion at 906.) Under that holding, every commodities trader who is not a floor trader, floor broker, or member of the exchange is excluded from the term "commodities dealer."

By disregarding the overall purpose of the term "commodities dealer" as enacted by the Deficit Reduction Act of 1984, the majority drastically limits the application of self-employment taxes to commodities traders and unfairly curtails the ability of certain commodities traders to make contributions to their self-employment plans. Accordingly, I respectfully dissent.

COHEN and CLAPP, *JJ.,* agree with this dissent.