HERBERT STOLLER and MARSHA STOLLER, Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent
Stoller v. Commissioner
Docket Nos. 8993-87, 27268-87, 27269-87
United States Tax Court
T.C. Memo 1990-659; 1990 Tax Ct. Memo LEXIS 734; 60 T.C.M. (CCH) 1554; T.C.M. (RIA) 90659; December 31, 1990, Filed Decisions will be entered under Rule 155. H, a general partnership of which P was a general partner, engaged in commodities trading utilizing both futures contracts and forward contracts. H allegedly cancelled the forward contracts and claimed the "cancellation fees" as ordinary losses, which were passed through to the partners. H replaced the cancelled forward contracts with new contracts with slightly different delivery dates. Held: The trading in both the futures market and with forward contracts had the requisite economic substance and profit motive. Held further: The cancellation fees are denied as ordinary losses on the ground that the contracts were not cancelled, but were offset. The losses are allowed as capital losses. Herbert Stoller, pro se. Steven R. Guest, Mark J. Miller, and Alan M. Jacobson for the respondent. FAY, Judge.PETERSON, Chief Special Trial Judge. FAY
*2213 MEMORANDUM FINDINGS OF FACT AND OPINION This case has been assigned to Chief Special Trial Judge Marvin F. Peterson pursuant to the provisions of section 7443A(b)(4) of the Internal Revenue Code and Rule 180 et seq. All section references are to the Internal Revenue Code, *735 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the Chief Special Trial Judge's opinion, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PETERSON, Chief Special Trial Judge: Respondent determined deficiencies and additions to tax in petitioners' Federal income taxes as follows. Additions to Tax
Docket No.
Year
Deficiency
Sec. 6653(a)
Sec. 6621(c) [1]
27268-87
1979
$ 108,840.22
$ 5,442.01
applicable
27269-87
1980
$  32,778.07
$ 1,638.90
applicable
8993-87
1981
$  12,048.00
applicable
Respondent determined that section 6621(c), an increased rate of interest for substantial underpayments due to tax motivated transactions, is applicable in the amount of 120 percent of the interest due on the entire amount of the deficiency for each year in question. In addition, respondent raised in his Amendment to Answer additions to tax under section 6653(a)(1) and (2) for the taxable year 1981 in the *736 amounts of $602.40 and 50 percent of the interest due on $ 12,048.00, respectively. The issues to be decided are (1) whether forward contracts entered into by Holly Trading Associates in the commodities markets were not bona fide transactions, (2) whether said forward contracts lacked economic substance and independent profit motive, (3) alternatively, if the transactions were bona fide with economic substance and profit motive, whether cancellation of the forward contracts constitutes the sale or exchange of capital assets for purposes of sections 1221 and 1222, (4) whether petitioners are liable for the increased rate of interest pursuant to section 6621(c), and (5) whether petitioners are liable for the additions to tax pursuant to section 6653(a) for the years 1979 and 1980, and section 6653(a)(1) and (2) for the year 1981. The use in our Findings of Fact of the following words and phrases is for convenience only and is not to be construed as a determination of the nature of any act or thing: forward contract, cancellation, transaction, spread, arbitrage, straddle, short position, long position, gain, loss, and other similar terms. FINDINGS OF FACT Some of the facts have been stipulated *737 and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners were residents of Smith's Parish, Bermuda, when the petitions at issue herein were filed. Petitioners timely filed their Federal income tax returns with a filing status of married filing jointly for all years in issue. All references to petitioner are to petitioner husband because the deficiencies determined by respondent are solely attributable to petitioner husband's partnership interest in Holly Trading Associates (Holly) and the flow-through of partnership gains and losses. Petitioner is an attorney with Curtis, Mallet-Prevost, Colt & Mosle in New York City and has practiced law in New York since 1952, specializing in commodity matters. Petitioner graduated from law school in 1952. In 1960 he received a Master of Laws in Taxation from New York University. During the years at issue, petitioner's law firm was general counsel for ACLI International Incorporated (ACLI). Petitioner was the attorney primarily responsible for the ACLI account and spent about one half his time on ACLI business. ACLI was incorporated under the laws of Delaware and has approximately *738 60 shareholders and 400,000 shares of stock outstanding. ACLI's headquarters are located in White Plains, New York. Petitioner owned 7 shares of ACLI stock worth less than $ 2,000 during the years at issue. *2214 During the relevant time period, ACLI was a dealer in physical commodities and through two of its wholly owned subsidiaries, ACLI Government Securities, Inc. (AGS) and ACLI International Commodity Services, Inc. (ACS), was engaged in business as a dealer in government securities and as a broker of commodity futures contracts. Additionally, ACLI engaged in other commodity business through other wholly owned subsidiaries not relevant herein. During the years in issue, AGS was a primary dealer in government securities, i.e., AGS bought and sold government securities for its own account. During 1981 AGS had assets totalling $ 1.2 billion dollars (pursuant to an audit by an independent certified public accounting firm dated August 31, 1981), a net worth in excess of ten million dollars, and was classified as a "primary dealer" in government securities. AGS had its principal place of business in Chicago, Illinois. During the years in issue, ACS was a futures commission merchant *739 and acted as a broker for customers who wanted to buy or sell commodity futures contracts on organized commodity exchanges. On or about October 10, 1979, eleven people associated with ACLI (including petitioner) organized Holly Trading Associates, a general partnership, pursuant to New York State law. As stated in the partnership agreement as amended and relevant herein, the purpose of the partnership was to buy, sell, trade, and otherwise deal in commodities and obligations of the United States Government or its agencies, contracts for the future, and forward delivery of said commodities and obligations. Petitioner contributed $ 10,000 out of total initial capital contributions of $ 77,500 for a 12.9 percent general partnership interest in Holly and served as one of three managing partners. A GENERAL DESCRIPTION OF HOLLY'S TRADING PLAN AND ITS TERMS
The idea of forming this partnership originated from a trading plan developed by Jonathan P. Wolff, an employee of ACS and one of Holly's managing partners. Mr. Wolff also contributed $ 10,000 to Holly for a 12.9 percent general partnership interest. The trading plan, as envisioned by Mr. Wolff and carried out by Holly, carefully monitored *740 the market for United States Treasury Bonds (T-Bonds) and Government National Mortgage Association Bonds (GNMA) and found opportunities to arbitrage T-Bond spreads against GNMA spreads. Mr. Wolff utilized both the futures contract market and forward contract trading to carry out his trading plan. T-Bonds are long term, coupon-bearing bonds issued by the United States Treasury. GNMAs, sometimes referred to as "Ginnie Maes," are long term coupon-bearing securities issued through the Government National Mortgage Association which represent undivided interests in specific pools of government guaranteed mortgages. These certificates are backed by the full faith and credit of the Federal government and are specifically exempt from the registration provisions of the securities laws. Forward contracts, or deferred delivery contracts, are privately negotiated agreements between parties to the terms of a trade which is scheduled to take place at some future date. A futures contract is a specific type of forward contract. It is a standardized executory contract to purchase or sell a specified quantity of a commodity at a fixed price. Futures contracts regarding sales and purchases of commodities *741 are regulated by the Commodity Futures Trading Commission through the Commodity Exchange Act. A spread, sometimes called a straddle, consists of two "legs." One of the legs is the purchase of a commodity for delivery at a specified future date. The other leg is the simultaneous sale of the same commodity for delivery at a different specified future date. This purchase and sale is carried out with either futures contracts or forward contracts. The party who buys the commodity is said to be in a long position and the party who sells the commodity is said to be in a short position. If the party holds an outright or naked long or short position, such party is in a risk position since the price of the underlying commodity will most probably rise or fall. A straddle reduces that risk because as the value of one leg decreases, the value of the other leg increases. In the unlikely event that the prices of the short and long legs of the straddle move exactly in tandem so that the difference between the market prices of the legs do not change, there will be no economic consequence to the party since the unrealized loss in one leg will be offset exactly by the unrealized gain in the other. *742 However, if the difference increases or decreases, the holder of the straddle will realize an economic gain or loss. Whenever one leg of a straddle is closed out by offset, i.e., the holder enters into an opposite futures or forward contract, an economic gain or loss generally results. The other leg of the straddle which was not closed out becomes an open contract, which is a risk position. The holder generally minimizes his risk by simultaneously entering into a replacement contract which is identical to the offset contract except for a modified delivery or settlement date. For example, if a loss leg is offset and an economic loss realized, the holder will simultaneously enter into a new contract to lock-in the unrealized gain inherent in the straddle transaction. This has frequently *2215 been used as a technique for realizing losses in one year and delaying the realization of the gain until the straddle is completely closed out in a later year. An arbitrage is the simultaneous purchase in one market and sale in another with the expectation of making a profit on price differences in the different markets. For example, an arbitrage of a T-Bond straddle against a GNMA straddle involves *743 the purchase of GNMA contracts and simultaneous sale of T-Bond contracts for settlement on the same date, entered into simultaneously with the sale of GNMA contracts and purchase of T-Bond contracts for settlement a given number of months later. A bull straddle exists when the delivery or settlement date of the purchase is earlier than the delivery or settlement date of the sale. A bear straddle exists when the delivery or settlement date of the purchase is later than the delivery or settlement date of the sale. HOLLY'S TRADING PLAN
Mr. Wolff's plan contemplated the arbitrage of T-Bond bull straddles against GNMA bear straddles and vice versa to make profits with minimum risks and with minimum requirements for capital. Mr. Wolff implemented this plan on both the futures market and with forward contracts. Although he had not utilized forward contracts in the past, Mr. Wolff felt that use of forward contracts pursuant to his plan would give Holly more flexibility. An example of the trading plan can be found in lines one through four in Appendix A which is entitled T-Bond/GNMA Transactions in the Futures Market. In general, Holly entered into a six month GNMA straddle arbitraged against *744 an opposite six month T-Bond straddle. Specifically, on May 8, 1980, Holly purchased 50 GNMA contracts ($ 5 million) which matured in March 1982 (settlement date) and simultaneously sold 50 GNMA contracts ($ 5 million) which matured in September 1982. (lines 1-2). This is a six month spread or straddle. This six month GNMA straddle was arbitraged against a six month T-Bond straddle. The T-Bond straddle is as follows: Holly purchased 50 T-Bond contracts ($ 5 million) which matured in September 1982 and simultaneously sold 50 T-Bond contracts ($ 5 million) which matured in March 1982 (lines 3-4). This spread arbitrage transaction was closed out less than one month later. Holly closed out these positions by offsetting the contracts by purchasing equal yet opposite contracts (lines 5-8). Hence, Holly sold 50 GNMA contracts which matured in March 1982, bought 50 GNMA contracts which matured in September 1982, sold 50 T-Bond contracts which matured in September 1982, and bought 50 T-Bond contracts which matured in March 1982. This resulted in a gain of $ 3,125. Petitioner was impressed with Mr. Wolff's plan and helped organize and form Holly during 1979 for the purpose of implementing *745 the plan. His trading plan was utilized solely by the partnership. From Holly's inception in 1979 through 1982, Mr. Wolff entered into several hundred transactions on behalf of Holly. All of the transactions were purchases and sales of either futures contracts that were executed through ACS as its broker or forward contracts that were entered into with AGS as a dealer. Holly traded contracts, not the underlying securities. Delivery of the underlying securities was never considered as a possibility with either the futures or forward contracts. These contracts were always cancelled or offset prior to the delivery or settlement date. In addition to trading government securities Holly also traded, in the futures market, physical commodities such as cocoa and sugar. The forward contracts used by Holly were standardized forms. The only difference among the contracts were the variables which exist when trading in futures, i.e., settlement date, rate, and amount of the commodity bought or sold. These transactions could have been made on the futures market instead of with forward contracts. By letter and check dated October 15, 1979, Holly made an initial margin deposit of $ 10,000 *746 to AGS for purposes of trading in forward contracts between Holly and AGS. In the futures market, a margin deposit is made by the client with his broker for the purpose of insuring the broker against loss. In the forward contract market, a margin deposit is made with the dealer to insure the dealer against loss. For example, if Holly should suffer losses in its spread arbitrage trading program relating to forward contracts, the margin deposit would cover those losses without further payment from Holly. The margin is not a partial payment on a purchase and does not represent a loan, as with securities. Although the value of the underlying contracts was very large, by utilizing spread arbitrage transactions the risk of loss was diminished, hence the relatively small margin deposit. In the forward market, there is irregular use of margins because the parties are generally well known to each other. Accordingly, there is less risk of nonpayment should there be losses on the transactions. Respondent has conceded that Holly's transactions involving trading in futures contracts were bona fide transactions with economic substance and entered into with the requisite profit motive. The *747 facts relating to the futures transactions are set forth for the purpose of comparison with the forward contract transactions and also for the purpose of setting forth the overall trading plan. *2216 A small portion of Holly's trading in futures transactions is set forth in Appendix A. These transactions paralleled a portion of Holly's trading in forward contracts during the years in issue. Holly created short-term government securities even though the underlying securities were long-term government securities. For example, by entering into a contract to purchase 15-year T-Bonds for delivery on a specified date and simultaneously entering into a contract to sell 15-year T-Bonds for delivery six months later, Holly created the economic equivalent of a contract to purchase a six month T-Bond. Holly then arbitraged that against simultaneous contracts to sell GNMAs on that specified date and purchase them six months later. As the last group of futures trading suggests (lines 17 through 32 set forth in Appendix A), upon occasion Holly switched one leg of a straddle to a different delivery month to create a three month straddle to replace the six month straddle. For example, lines 17 through *748 24 involve six-month straddles; however Holly switched the GNMAs to a three-month straddle in lines 25 and 26 by simultaneously selling for delivery in March and buying for delivery in June. This resulted in what is known as a "butterfly straddle," which is actually two straddles with four legs having one common intermediate delivery month. It is called a butterfly straddle because, when drawn schematically, it resembles a butterfly. The above straddle can be drawn as follows: Short March 1982 GNMA
Short Sept 1982 TBond
Long June 1982 TBond
Long June 1982 GNMA
The middle position or "body" of a perfect butterfly straddle is exactly twice the size of each outside position or "wing." Butterfly straddles are utilized because they typically present less chance of either favorable or unfavorable spread movements, and, therefore, are less of a risk position than the other straddle positions entered into by Holly. This particular butterfly straddle is even less risky than most because of the relatively short time period among the legs of the straddle and the three month uniformity of that time period. These straddles entered into in the futures market are not at issue herein. The large losses *749 realized in September of 1980 due to the switch transaction and resulting butterfly straddle described above were allowed by respondent as being losses from bona fide transactions with economic substance and the requisite independent profit motive. The forward contracts that were entered into between Holly and AGS are summarized by respondent and set forth in Appendix B. Respondent did not recognize the gains and losses which resulted from the transactions utilizing forward contracts. These are the only transactions in dispute herein. The straddles utilized by Holly's trading plan in forward contracts, as in the futures, were set up to speculate on changes in interest rates. When interest rates made large moves, the change in the value of the straddle was moderated by the fact that as one leg of the straddle increased in value, the other leg decreased in value by a similar amount. Although the change in value of any given straddle remained fairly constant, one leg reflected a large loss and the other leg reflected a large gain when interest rates fluctuated widely. It was at this point that petitioner directed Mr. Wolff to cancel or offset the loss legs and replace those legs *750 with new contracts for slightly different delivery dates, thereby locking in the unrealized gain. At the same time Holly recognized a comparable loss. The sole purpose in cancelling the forward contracts rather than offsetting them was to take advantage of what petitioner saw as an apparent conversion of a capital loss to an ordinary loss. This resulted in large ordinary losses in earlier years and large capital gains in subsequent years. Holly's arrangement with AGS regarding the cancellation of forward contracts in 1979 and 1980 was as follows: 1. Mr. Wolff called AGS and told AGS to cancel specific forward contracts. 2. AGS sent a letter to Holly confirming the cancellation and charged a cancellation fee based upon hypothetical sales of the contracts. 3. Holly simultaneously entered into new replacement contracts with different delivery dates which locked in the unrealized gains on the other legs of the straddles. 4. Just prior to the end of the taxable year, the Holly partners took out loans and made contributions to their capital accounts in Holly. Holly paid the cancellation fee and reported it as an ordinary loss on the partnership level, which then passed through to *751 the individual partners as an ordinary loss. 5. After the first of the year, AGS paid back a similar amount of money to Holly because of the unrealized gains that had been locked in on these straddles. Holly then distributed this money to its partners as a return of capital. 6. The Holly partners repaid their bank loans approximately one to two weeks after having been loaned the money. *2217 7. The straddles were eventually closed out by entering into offsetting contracts and capital gains were reported by the partnership. The capital gains passed through to the partners. Petitioner properly reported these capital gains on his individual tax returns. On December 24, 1979, petitioner borrowed $ 100,000 from Citibank, N.A. and made a capital contribution of the same amount to Holly. On January 4, 1979, petitioner repaid the loan in full incurring an interest charge in the amount of $ 391.49. On December 26, 1980, petitioner borrowed $ 198,975.00 from Citibank, N.A. and made a capital contribution of the same amount to Holly. On January 2, 1981, Holly returned the money to petitioner and petitioner was then able to repay the loan in full. A mixed arbitrage transaction was established *752 on the forward market on November 5 and November 7, 1980, with T-Bond straddles (Appendix B-2, lines 13-16.) Simultaneously, Holly entered into short sales of futures contracts in 90-day Treasury Bills. Holly cancelled all four legs of the T-Bond straddles on November 25, 1980 (Appendix B-2, lines 17-20), when it liquidated the arbitrage and the end result was a $ 10,000 loss from the forward contracts (claimed as an ordinary loss due to cancellation fees), and a $ 2,075 capital gain from closing out the 90-day Treasury Bill futures. As shown on the chart in Appendix B-2, Holly paid AGS cancellation fees on two of the legs and AGS paid Holly cancellation fees on the other two legs. These forward contracts cancelled on November 25, 1980, were not cancelled to take advantage of large loss legs. Instead, all four legs of the T-Bond straddle transaction were cancelled in order to liquidate the entire spread arbitrage transaction. There were no cancellations of forward contracts during the year 1981. The losses from the spread arbitrage transactions that were disallowed by respondent were capital losses realized and recognized pursuant to offsetting forward contracts. These contracts *753 were offset for the purpose of changing the delivery dates of the contracts. This resulted in a butterfly straddle which was similar to the butterfly straddle entered into in the futures market as described above. The forward contract butterfly straddle can be laid out schematically as follows: Short Sept 1981 GNMA
Short March 1982 TBond
Long December 1981 TBond
Long December 1981 GNMA
The 1981 deficiency determined by respondent is solely attributable to Holly's spread arbitrage transactions. On March 4, 1982, Holly closed out all of its spread arbitrage transactions in the forward market and abandoned its trading plan. In 1979 Holly reported a capital gain of $ 1,875 from trading in forward contracts, and an ordinary loss of $ 837,500 from cancellation fees. Holly's net short-term capital gain reported for the year 1979 from all commodities trading was $ 4,029. In 1980 Holly reported, in part, capital gains in the amount of $ 850,000 due to closing out the straddles involving the contracts cancelled during 1979. Also in 1980 Holly reported a net short-term capital gain of $ 7,500 from trading in forward contracts (straddles opened and closed during 1980) and an ordinary loss of *754 $ 826,219 from cancellation fees paid to AGS. Holly's net short-term capital gain reported for the year 1980 from all commodities trading was $ 26,509. In 1981 Holly reported a net short-term capital loss of $ 349,468 from trading in forward contracts. Holly also reported a net short-term capital gain from trading in the futures market of $ 899,707. Respondent disallowed the net loss from trading in forward contracts, but did not disallow the gain from trading in the futures market. When all forward contract straddle positions were closed out in 1982, Holly reported a short-term capital gain of $ 1,095,125. Holly also reported short-term capital losses in the amount of $ 578,498 from trading in futures contracts. Holly's net short-term capital gain reported for the year 1982 from all commodities trading was $ 516,627. In 1982 petitioner sold his partnership interest in Holly for 90 percent of net asset value as of February 28, 1982. Petitioner reported a capital gain on the sale of his partnership interest of $ 143,703.00 on his 1982 Federal income tax return. PRICING OF THE FORWARD CONTRACTS
Pricing of the forward contracts was based upon prices on the transaction dates in the *755 futures market. The prices in the futures market as relevant are set forth in Appendix C-1 and C-2 and are compared with prices assigned to the legs of the straddles by AGS. These prices were gathered from the New York edition of the Wall Street Journal by respondent's expert witness and are for GNMA and T-Bond futures contracts traded over the Chicago Board of Trade. The GNMA and T-Bond futures contracts are based upon the 8% coupon issue. The GNMA contract assumes a 12 year prepayment. These terms are consistent with the forward contracts entered into between Holly and AGS. *2218 The Chicago Board of Trade Rules and Regulations, dated January 1, 1979, establishes the price basis for trading in GNMA and T-Bond futures contracts on the Chicago Board of Trade. Minimum price fluctuations are in multiples of one thirty-second (1/32) point per 100 points or $ 31.25 per contract with each contract worth $ 100,000. In economic terms, the only important price in a straddle transaction is the price differential between the two legs. That differential will determine the gain or loss when the position is closed out. Pricing of the futures and forward contracts entered into by Holly occurred *756 in the following manner. Mr. Wolff negotiated the price differential between the long and short positions of each straddle and, once that was agreed upon, left it to the floor trader (futures contracts) or to AGS (forward contracts) to assign prices to the two legs of the straddle keeping the price differential as negotiated. When Mr. Wolff negotiated with AGS or ACS regarding offsetting positions, again he would negotiate only the price differential, i.e., he would negotiate only the price differential between the replacement long (or short) position and the already established short (or long) position. When Mr. Wolff notified AGS that he wanted a particular forward contract cancelled, AGS assigned a "cancellation fee" to the contract based upon the cost of a hypothetical offsetting contract. Simultaneously, Holly entered into a replacement contract as negotiated by Mr. Wolff to preserve the price differential in the straddle and lock-in the unrealized gain. The end result was that Holly maintained its bargained for price differential in the spread and locked in a gain in the other leg of the straddle which was roughly equivalent to the cancellation fee. BONA FIDE TRANSACTIONS *757 Respondent's expert witness, prior to trial, was given only the information pertaining to the forward contract transactions entered into by Holly. He did not have any knowledge of Holly's overall trading plan. He did not have any knowledge that Holly entered into any futures transactions during the period in question. Respondent's expert concluded that the forward contracts between Holly and AGS were bona fide transactions. As an ultimate finding of fact based upon the entire record, we find that the forward contract transactions between Holly and AGS were bona fide transactions. OPINION The principal issue for our decision is whether petitioners may deduct the ordinary and capital losses generated by the forward contract commodity tax straddles entered into by Holly. The Economic Recovery Tax Act of 1981, Pub. L. 97-34, secs. 501-509, 95 Stat. 323-335 has dealt extensively with commodity tax straddles effective for straddles entered into after June 23, 1981. As a preliminary matter, we note that all straddles at issue herein were entered into prior to the effective date of this legislation. Because this legislation was not intended to have retroactive effect, it is not applicable *758 in letter or in spirit to the transactions at issue herein. Economic Recovery Tax Act of 1981, supra at sec. 508. Prior to the enactment of the Economic Recovery Tax Act of 1981 (ERTA), commodity tax straddles were a common method among wealthier taxpayers to shelter income. Because the Internal Revenue Code did not contain any specific rules dealing with straddles, commodity tax straddles became a well known tax loophole. The Senate Finance Committee estimated that without the new legislation enacted pursuant to ERTA, the tax revenues lost from straddle transactions would have exceeded $ 1.3 billion for 1982. Contained within the Senate Finance Committee Report was a rather detailed description of a typical commodity tax straddle which was, prior to ERTA, a perfectly legal way to shelter income, provided the transactions were bona fide and with economic substance. This description is as follows: A taxpayer using a simple futures straddle as a tax shelter will establish a position in contracts with contract prices of about, say, $ 10,000 each. The two contracts, one to buy, the other to sell, are identical in every respect, except for their delivery months. Because the taxpayer's *759 position is a straddle, his margin deposit will be very low--as little as one percent of the value of the position ($ 200). The taxpayer will wait for the market to move, so that one leg of the straddle shows a loss, e.g., $ 500, and the other leg shows an almost identical gain. The taxpayer will liquidate the loss by entering into the opposite futures contract for the same month. (A contract to sell December wheat, for example, is liquidated by executing a contract to buy December wheat.) In order to maintain a balanced, minimal-risk position, the taxpayer will replace the liquidated leg with a contract which is identical, except for its delivery month. (The replacement contract will have a contract price of about $ 9,500, if the original long leg was liquidated at a loss, or a contract price of about $ 10,500, if the original short leg was liquidated at a loss.) The taxpayer will claim the decrease in value in the liquidated leg as a $ 500 short-term capital loss and deduct it from his income, thereby eliminating a $ 500 short-term gain for the tax year. At the same time, the taxpayer will continue to hold the other *2219 leg, which will have an unrealized gain approximately equal *760 to his "realized loss," that is, about $ 500. However, the taxpayer will not have made any payment on the liquidated leg because no payment is due on a futures contract until its delivery date. In addition, because the taxpayer maintained balanced positions, he ordinarily will not be required to deposit any additional margin into his margin account. The taxpayer will hold the two legs into the following year. In the second year, the taxpayer will close out the two positions. Assuming the holdover contract has increased another $ 500 in value, the taxpayer will recognize a total gain of about $ 1,000 on the original leg and about a $ 500 loss on the replacement leg. If the gain is on the long (buy) position and that position was held for over six months, the taxpayer will report a $ 1,000 long-term capital gain on the long position and a $ 500 short-term capital loss on the short position. If he has no other capital transactions for the year, he will report the $ 500 difference between these legs as long-term capital gain. (His margin, less commission, will be returned.) Thus, he will have succeeded in deferring his short-term capital gain for one year and converting it to a long-term *761 capital gain. If the gain is in the short (sell) position, the gain will be short-term capital gain. In this case, the taxpayer gets a one-year deferral, but no conversion. S. Rept. 97-144 (1981), 1981-2 C.B. 412, 474. The above description does not differ significantly from Holly's transactions both in futures and forward contract trading. Holly's transactions in the futures market were conceded by respondent to be bona fide and with economic substance pursuant to the law as expressed above, prior to the changes enacted by ERTA. Because the forward contract transactions were profit motivated and virtually identical to the clearly bona fide futures contract transactions, we have found that the forward contract transactions were bona fide. Previously, in deciding whether commodity straddles of futures or forward contracts were to be recognized for tax purposes, this Court has focused on two aspects of the transactions. In the majority of cases we have found the transactions themselves to be factual shams: Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990); Price v. Commissioner, 88 T.C. 860 (1987); Forseth v. Commissioner, 85 T.C. 127 (1985), affd. 845 F.2d 746 (7th Cir. 1988), *762 affd. sub nom. Enrici v. Commissioner, 813 F.2d 293 (9th Cir. 1987), affd. sub nom. without published opinion Bramblett v. Commissioner, 810 F.2d 197 (5th Cir. 1987), affd. sub nom. Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affd. sub nom. without published opinion Woolridge v. Commissioner, 800 F.2d 266 (11th Cir. 1986); Brown v. Commissioner, 85 T.C. 968 (1985), affd. sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988). In another group of cases, this Court has found a lack of economic substance: Glass v. Commissioner, 87 T.C. 1087 (1986), affd. sub nom. Lee v. Commissioner, 897 F.2d 915 (8th Cir. 1989), affd. sub nom. Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Keane v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988); *763 Ewing v. Commissioner, 91 T.C. 396 (1988); Boswell v. Commissioner, 91 T.C. 151 (1988). We have found that Holly's transactions utilizing forward contracts were bona fide transactions, and, therefore, the next issue for our decision is whether Holly's transactions utilizing forward contracts had economic substance. When transactions are not factual shams but are bona fide, we turn to section 108 [2] of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reduction Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817-2818, to decide whether the transactions had economic substance. Forseth v. Commissioner, 85 T.C. at 166. Section 108, as amended, states in relevant part: SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981. (a) GENERAL RULE. -- For purposes of the Internal Revenue Code of 1954, in the *2220 case of any disposition of 1 or more positions -- (1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by *764 title V of the Economic Recovery Tax Act of 1981 do not apply, any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. * * * The parties agree that the transactions at issue were straddles within the meaning of section 108. Because petitioner's investments were made through Holly, the existence of a trade or business and the existence of a profit motive must be determined at the partnership level. Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Rosenfeld v. Commissioner, 82 T.C. 105, 112 (1984). Petitioner contends that the losses at issue herein were incurred in a trade or business, and, therefore, the deductiblity of Holly's losses is not subject to the profit motive test of section 108. Alternatively, petitioner contends that Holly's primary purpose in entering into all of its contracts with AGS was to further the profit-making objectives of its arbitrage program. Respondent contends Holly did not enter into the forward contract straddle transactions *765 with AGS primarily for profit. Respondent further contends that the most important factor determining profit motive is the trading pattern involved and the existence of "switch transactions," and cites Miller v. Commissioner, 836 F.2d 1274, 1277 (10th Cir. 1988); Ewing v. Commissioner, 91 T.C. at 400-401; Glass v. Commissioner, 87 T.C. at 1173; and Fox v. Commissioner, 82 T.C. at 1023. Neither respondent nor petitioner contends that Holly was a commodities dealer for purposes of the profit motive presumption of section 108(b). See Kovner v. Commissioner, 94 T.C. 893 (1990). The first factor we must consider is whether Holly was engaged in a trade or business, and, whether Holly should be classified as an investor or as a trader. No matter how extensive an investor's activities might be, an investor is never considered to be engaged in a trade or business with respect to investment activities. Higgins v. Commissioner, 312 U.S. 212 (1941). It is also well settled that in order for a trader to be engaged in a trade or business, that trader must engage in frequent and substantial trading, must seek profits from short-term market swings, and must receive income principally from trading *766 rather than from dividends, interest, or long-term appreciation. Groetzinger v. Commissioner, 480 U.S. 23 (1987). See Laureys v. Commissioner, 92 T.C. 101, 136 (1989). In King v. Commissioner, 89 T.C. 445 (1987), for purposes of characterizing an interest expense pursuant to section 163(d), we discussed what constitutes activities which rise to the level of a trade or business. The taxpayer in King was trading commodities solely for his own accounts. Although this factor frequently is an indication that the taxpayer is an investor rather than a trader, since the taxpayer in King spent approximately 6 hours per day on trading and activities related to his trading, we found that he was a trader engaged in a trade or business. Additional factors we considered were that the taxpayer traded on the futures market utilizing over 20 different commodities and maintaining 11 trading accounts. Holly's trading activities involved seeking profits from short-term market swings. As in King, Holly's trading was for its own account; however, its trading activities only occurred on a limited number of days during a three year period. Holly did not engage in trading activities on a daily basis. *767 Holly did gain profits from short-term market swings, and did receive income principally from trading rather than from dividends, interest, or long-term appreciation. However, Holly's trading was not regular or continuous, but rather sporadic. We find that although Holly was a trader and not an investor, its trading activities did not rise to the level of a trade or business for purposes of section 108. When a taxpayer, in this case a partnership, is trading solely for its own account, the volume of trading must be very regular and substantial in order to rise to the level of a trade or business. Therefore, Holly will not be given the benefit of a presumptive profit motive since Holly was not engaged in a trade or business. The next issue is whether an actual profit motive was present in Holly's trading activities. Prior to 1984 and the enactment of section 108, we decided whether losses on straddle transactions were deductible based upon section 165(c)(2) and the "primarily for profit" test. Smith v. Commissioner, 78 T.C. 350, 390 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). In Smith, a case involving commodity straddle transactions with respect to *768 silver futures contracts, we emphasized the necessity of a nontax profit objective. We also held that such "hope of deriving an economic profit aside from the tax benefits need *2221 not be reasonable so long as it is bona fide." Smith v. Commissioner, supra at 391. The taxpayers were solicited, in Smith, to make these investments in straddles solely because they had short-term capital gains which these investments could defer. Information given to the investors/taxpayers indicated there would be no economic profit from their investments. Substantial tax savings were the objective of these investors/taxpayers. Therefore, after looking at the "entire commodity tax straddle scheme," Smith v Commissioner, supra at 391, we held that the taxpayers lacked the requisite economic profit objective necessary to enable them to deduct their commodity tax straddle losses pursuant to section 165(c)(2). Smith v Commissioner, supra at 394. Subsequent to our decision in Smith, Congress enacted section 108 to apply to commodity straddle transactions. Section 108, as originally enacted in 1984, was interpreted by this Court as requiring that the taxpayer have a "reasonable prospect of any profit" before *769 being allowed deductions for losses sustained in commodity trading. Miller v. Commissioner, 84 T.C. 827 (1985), revd. 836 F.2d 1274 (10th Cir. 1988). In 1986 section 108 was amended to include the "for profit" language contained in section 165(c)(2). As applicable herein, section 108 as amended by the 1986 Tax Reform Act, specifies that any loss from trading in straddles entered into before June 23, 1981, shall be allowed for the taxable year of the disposition if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. In Boswell v. Commissioner, 91 T.C. 151, 159 (1988), a case involving commodity straddle transactions with respect to options in U.S. Treasury bills, we held that pursuant to the amended section 108(a), investors in commodity straddle transactions must establish that they entered into the transactions primarily for profit; and, the "reasonable prospect of any profit" test established in Miller v. Commissioner, supra at 843, interpreting the prior version of section 108 would not be followed. Instead, we held that the same profit motive test that has historically been utilized in connection with section 165(c)(2) *770 applied in Smith, supra, was the proper test indicated under the amended statute. Boswell v. Commissioner, 91 T.C. 151, 158-159 (1988). See Glass v. Commissioner, 87 T.C. at 1167. In Ewing v. Commissioner, 91 T.C. 396 (1988), a case involving commodity straddle transactions with respect to gold futures contracts, we applied the section 108 "primarily for profit" test set forth in Boswell. We relied upon our interpretation of the section 165(c)(2) profit motive test as set forth in Fox v. Commissioner, 82 T.C. 1001, 1021 (1984), a case involving commodity straddle transactions with respect to options in U.S. Treasury bills. This test, including references to Fox, is as follows: (1) The ultimate issue is profit motive and not profit potential. However, profit potential is a relevant factor to be considered in determining profit motive. 82 T.C. at 1021. (2) Profit motive refers to economic profit independent of tax savings. 82 T.C. at 1022. (3) The determination of profit motive must be made with reference to the spread positions of the straddle and not merely to the losing legs, since it is the overall scheme which determines the deductibility or nondeductibility of the loss. 82 T.C. at 1018, *771 citing Smith v. Commissioner, 78 T.C. at 390-391. (4) If there are two or more motives, it must be determined which is primary, or of first importance. The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent. 82 T.C. at 1022. (5) Because the statute speaks of motive in "entering" a transaction, the main focus must be at the time the transactions were initiated. However, all circumstances surrounding the transactions are material to the question of intent. 82 T.C. at 1022. Ewing v. Commissioner, 91 T.C. 396, 418 (1988). One factor we found significant in applying the above test in Ewing was that the promotional materials for the straddle investment scheme emphasized the tax benefits. Economic profitability was not seriously discussed or quantified by the promoters. Also, the taxpayers frequently held positions which minimized profits, however maximized tax savings. Additionally, the "alternative liquidation techniques" of cancellations and assignments devised by the promoter cost more to the investor in commissions, however gave the investors more beneficial tax savings. We found that *772 the taxpayers regularly utilized these alternative liquidation techniques. Additionally, we found that the investors invested in this scheme for the specific purpose of generating tax losses. Ewing v. Commissioner , supra at 419-420. Therefore, we found that the taxpayers had not entered into their investments in commodity straddle transactions primarily for profit. Ewing v. Commissioner, supra at 420. In the case before us, as in Fox and Ewing, we proceed with the issue of whether there was primarily a profit motive or primarily a tax *2222 savings motive in entering into the commodity trading transactions. As the above test indicates, we will look to the overall trading strategy, and will look primarily to the intent of Holly, hence of Holly's partners, at the time the straddle transactions were entered into between Holly and AGS. Respondent contends the forward contracts were not entered into primarily for profit and points to Holly's use of switch transactions as a clear indication of the lack of a profit motive. In Ewing v. Commissioner, supra at 401, we explained the mechanics of switch transactions and explained they were an integral part of tax straddles. For purposes herein, *773 we note that bona fide tax straddles with economic substance do not automatically lack profit motive. Our analysis of switch transactions in Fox v. Commissioner, supra at 1023, focused on determining whether the switch transactions precluded any hope of recognizing gains on those affected straddles. In Fox we found that after the switch transactions in question, it "became theoretically impossible for [the taxpayer] to achieve a gain." Fox v. Commissioner, supra.
In the case before us, the switch transactions did not preclude the ultimate recognition of economic gain. For example, as set forth in Appendix B in the 1979-1980 straddle transactions, on October 12, 1979, Holly purchased GNMA contracts in the amount of $ 10 million at a rate of 77 7/32 for $ 5 million (line 5) and 77 8/32 for $ 5 million (line 7) with a settlement date of September 16, 1981. On October 24, 1979, Holly cancelled those contracts at a rate of approximately 73 8/32 for a loss of $ 401,562.50 (lines 17 and 18). Holly then entered into identical new contracts except with settlement dates of June 17, 1981, at a rate of 73 14/32 (lines 21 and 22). This was the transaction constituting the "switch" from a six *774 month straddle to a three month straddle. Subsequently, Holly sold these contracts at a rate of 77 21/32 and recognized a gain of $ 421,875 (line 26). Offsetting the recognized loss against the recognized gain yields an economic gain of $ 20,312.50. Therefore, in this situation, Holly ultimately recognized a gain pursuant to a switch transaction. Accordingly, respondent's argument that a switch transaction automatically indicates a lack of profit motive is misplaced. Holly's purpose in entering into the switch transactions was generally to maximize the potential for gain or to shorten the window of risk by changing a 6 month straddle to a 3 month straddle. After analyzing the entire record, we conclude that Holly entered into the futures and forward contract trading primarily for profit. Much of the trading in the futures market was not done at yearend and so there were no tax savings. Although a portion of the trading in forward contracts was done in a manner specifically to maximize tax savings, i.e., the contract cancellations, those cancellations occurred because of the market conditions and a situation that arose after Holly entered into the initial trades. Therefore, Holly's *775 intent at the time the trades were initially entered into was not to realize great tax savings, but to realize a profit from the trading as a whole. Additionally, the factors present in Ewing are not present in the case before us. There were no promotional materials emphasizing the tax savings, and, there was an expectation of profit as a result of the trading entered into by Holly. There were actual gains and actual losses from this trading. For example, in the final GNMA straddle closed out by Holly on March 4, 1982 (see Appendix B-2 lines 2, 23, 31, and 32), Holly lost approximately $ 70,000. This was because of a risk position which was exposed on September 18, 1981, when Holly closed out the T-Bond straddle against which the GNMA straddle had originally been arbitraged. We conclude that the profit motive in the futures trading is clearly present, as respondent concedes, and although there seems to be less of a profit motive and less profit potential in Holly's trading in forward contracts, we note that the overall trading strategy is what is determinative. Glass v. Commissioner, 87 T.C. at 1163; Smith v. Commissioner, supra at 390-391. Holly's motive in cancelling the loss *776 legs is one factor to consider, but is not determinative when deciding whether a profit motive is present. The overall trading strategy was embodied in Mr. Wolff's trading plan which contemplated realizing profits from trading in commodities. The plan also contemplated utilizing trading methods to minimize risk. Additionally, the plan contemplated arranging some trades at yearend to take advantage of tax savings by accelerating the recognized losses and delaying the recognized gains. There were clearly some tax-motivated transactions by Holly. We conclude, however, that the majority of the transactions were profit motivated, and, therefore, Holly entered into its trading plan primarily for profit. Accordingly, Holly's activities in the forward market had profit motive and economic substance, and the capital losses realized and recognized pursuant to that trading were properly reported by Holly and petitioner. The next issue for our decision is whether the losses claimed by Holly and petitioner as a result of "cancellation fees" were properly claimed as ordinary loss deductions by petitioners. Respondent contends, in the alternative, that losses due to cancellation of the forward *777 contracts are capital losses, not ordinary losses, since they result from the sale or exchange of *2223 capital assets pursuant to sections 1221 and 1222. Respondent carries the burden of proof on this issue because it was raised in an Amendment to Answer, and, therefore, constitutes a new matter. Rule 142(a). Respondent argues that because gain or loss realized upon offsetting forward contracts is capital gain or capital loss as we held in The Hoover Co. v. Commissioner, 72 T.C. 206, 248-249 (1979), the cancellation of a forward contract should have the same result since there is no economic difference between cancellation of the forward contracts and offsetting those same contracts. Section 1234A [3] specifically provides that gain or loss from the cancellation of a right or obligation with respect to personal property, which is a capital asset in the hands of the taxpayer, shall be treated as a capital gain or loss. This section applies only to property acquired or positions established after June 13, 1981. Petitioner contends that because section 1234A does not apply herein, the corollary of section 1234A should apply, i.e., cancellations of forward contracts produce ordinary losses *778 and gains. The Senate Finance Committee Report, as relevant, states as follows: Present Law The definition of capital gains and losses in section 1222 requires that there be a "sale or exchange" of a capital asset. Court decisions have interpreted this requirement to mean that when a disposition is not a sale or exchange of a capital asset, for example, a lapse, cancellation, or abandonment, the disposition produces ordinary income or loss. [fn. See [Leh] v. Comm'r, 260 F.2d 489 (9th Cir., [1958]) and Comm'r v. Pittston Co., 252 F.2d 344 (2d Cir., 1958), cert. denied, 357 U.S. 919 (1958).] * * * Reasons for Change * * * Some taxpayers and tax shelter promoters have attempted to exploit court decisions holding that ordinary income or loss results from certain dispositions of property whose sale or exchange would produce capital gain or loss. * * * As a result of these interpretations, losses from the termination, cancellation, lapse, abandonment and other dispositions *779 of property, which are not sales or exchanges of the property, are reported as fully deductible ordinary losses instead of as capital losses * * *. Some of the more common of these tax-oriented ordinary loss and capital gain transactions involve cancellations of forward contracts for currency or securities. The committee considers this ordinary loss treatment inappropriate if the transaction, such as settlement of a contract to deliver a capital asset, is economically equivalent to a sale or exchange of the contract. * * * S. Rept. 97-144 (1981), 1981-2 C.B. 412, 480.
Petitioner argues that because Congress changed the law, it is an acknowledgement and affirmation that the law prior to the addition of section 1234A authorized Holly and petitioner to report the cancellation fees as ordinary losses. We disagree. The above language suggests Congress is merely clarifying existing law, rather than changing the law. Existing law prior to the enactment of section 1234A can be found in the cases cited above by the Senate Report. The taxpayers in Leh v. Commissioner, 260 F.2d 489 (9th Cir. 1958), affg. 27 T.C. 892 (1957), received a cancellation fee as the result of the termination of *780 a gasoline purchase contract. The courts found that there was no sale or exchange since the taxpayers' rights were extinguished by the termination. The effect of this was a complete termination of rights to purchase gasoline, not a sale or exchange of those rights. Commissioner v. Pittston Co., 252 F.2d 344 (2d Cir. 1958), revg. and remanding 26 T.C. 967 (1956), involved a similar termination of the right to purchase coal. The Court of Appeals for the Second Circuit held that this was the release of contract rights by the taxpayer rather than a sale, and, therefore, the taxpayer recognized ordinary income. In both of these cases, after the termination of the contract in question, there was nothing remaining of the transaction out of which the original transaction arose. In the case at bar, with the exception of the cancellations occurring on November 25, 1980, after the cancellation of the loss legs of the spread arbitrage transactions there remained the gain legs of the spread arbitrage. Also, simultaneously a replacement contract was entered into which was identical to the cancelled contract except for the delivery date. It is well settled that the substance of a transaction *781 determines Federal income tax liability rather than its form. The Supreme Court established long ago that "the incidence of taxation depends upon the substance of a transaction. *2224 * * * the transaction must be viewed as a whole, and each step * * * is relevant." Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). In the case before us, Mr. Wolff and Holly wished to change the delivery dates on these straddles in order to shorten the window of risk of the straddle, and, therefore, wished to offset the current contracts and enter into new contracts for different delivery dates in all cancellations except those occurring on November 25, 1980. These are sometimes called switch transactions. It does not extinguish all rights of the parties to the transaction, but rather switches or exchanges those rights. We will determine the substance of the alleged cancellation transactions by looking to the entire spread arbitrage transaction and the economic consequences sought by the parties. Glass v. Commissioner, 87 T.C. at 1174. When Mr. Wolff requested the cancellation of a contract or series of contracts, it was part of an ongoing straddle and was for the purpose of changing Holly's *782 window of risk. He did not want to terminate Holly's straddle with AGS, he just wanted to change the delivery date of one leg and accelerate the loss to be recognized by Holly and its partners. To call this a cancellation is a misnomer. In substance, Holly and AGS entered into offsetting contracts to close out the loss legs held by Holly. Holly simultaneously entered into replacement contracts or switch transactions. Holly and AGS did not bargain for the contracts separately, but rather priced them according to the spread in price between the legs of the straddle. When Mr. Wolff, on behalf of Holly, was negotiating a "cancellation fee," Mr. Wolff and AGS based it on the price of similar offsetting contracts in the futures market. See Appendix C-1 and C-2. Respondent contends that the cancellation fees took the low end of the futures contract pricing spectrum on each particular day a contract was cancelled. Respondent further contends AGS compensated by pricing the replacement contracts at a low price also, thereby maximizing the gain Holly would eventually realize. Pricing of forward contracts is not tied to the futures market in any formal manner, except for convenience. Pricing *783 of forward contracts is negotiated between the two parties to each contract. As we noted in Forseth v. Commissioner, 85 T.C. at 135, forward contracts are agreements between principals which are not traded on any recognized exchange. Unlike futures traded on regulated exchanges, the forward trades were not subject to any limits on price movements which could occur during each trading day. The price of a forward contract on an unregulated market will not necessarily be the same as an otherwise comparable futures contract on a regulated exchange. If a cancellation fee was priced at a low price as compared to corresponding futures contracts, it follows that the replacement contract would also reflect a similar low price. When a contract is cancelled, it is generally because of a mistake in the contract. The cancelled contract is then replaced with an identical contract absent the mistake. As we have noted previously, The use of a cancellation to close, dispose of, or settle a forward contract is not a common practice by dealers in such contracts. For the most part, cancellations are used by such dealers only to correct errors. Brown v. Commissioner, 85 T.C. at 994. Petitioners *784 concede there were no errors in the contracts that were cancelled. Mr. Wolff testified he was seeking the economic consequences of an offset, but called it a cancellation pursuant to petitioner's urging in order to recharacterize the loss as ordinary. We do not think Holly, and petitioner, were justified in recharacterizing losses merely by changing the name attached to a series of transactions. The substance of the transactions, although called forward contracts closed by cancellation, was in reality forward contracts closed by offset. Therefore, Holly's cancellation fees are recharacterized as offsets for all cancellations except those occurring on November 25, 1980. The negotiations between Mr. Wolff and AGS to determine the cancellation fees correspond to negotiations which would have occurred between the parties had they instead entered into offsetting contracts. Accordingly, we conclude that Holly's cancellation fees reported as ordinary losses should have been reported as capital losses. Once again, it appears that respondent's real objection to Holly's forward contract trading is that over several years, Holly's earlier recognized losses would be offset by later recognized *785 gains, and, therefore, Holly was not recognizing a true economic loss, regardless of whether that loss was called a "cancellation fee" or actually a capital loss due to offsetting contracts. Recently, we discussed this situation as follows: In the instant case, petitioners sought to get from a position where they had significant short-term capital gains in year one to a position where they had long-term capital gains of roughly the same amount in year two. To aid them in their quest, they acquired certain property and engaged in certain transactions with that property and other property. Losses were produced in year one, and gains were produced in year two, thus achieving at least their goal of deferral. *2225 The above description of what petitioners did is the very essence of the typical tax shelter investment where losses in the early years are eventually offset by gains in future years. Respondent has not pointed us to any court decision which to this date has held that the step transaction doctrine requires that gains and losses in a tax sheltering investment spanning the course of more than 1 taxable year must be integrated and recognized only at the termination of such an investment *786 2, 5, or 20 years down the road. Indeed, such an argument would go far toward undermining the very system of annual tax accounting. Smith v. Commissioner, 78 T.C. 350, 389 (1982), affd. without opinion 820 F.2d 1220 (4th Cir. 1987). Accordingly, Holly's losses which are now characterized as capital losses, are properly recognized in the years as reported by Holly. See Laureys v. Commissioner, 92 T.C. 101, 130-131 (1989). The cancellations by Holly on November 25, 1980, are somewhat different from the previous cancellations because the entire straddle of four contracts was cancelled and no replacement contracts were entered into. Holly realized and recognized a net $ 10,000 loss on the cancellation fees. Holly reported this as an ordinary loss, which was then passed through to the partners. The substance of this transaction, viewed as a whole, was a complete termination of Holly's and AGS' rights pursuant to the straddle, i.e., the four forward contracts that were cancelled. There was no sale or exchange. There were no replacement contracts entered into simultaneously when the contracts were cancelled. There were no rights or property interests that continued after the four legs *787 of the straddle were cancelled. The line of cases cited by both petitioners and respondent, some finding the cancellation of a contract yielding ordinary treatment and some finding the cancellation of a contract yielding capital treatment, have as a distinction whether or not, after the cancellation, any rights or property interests created by the contract remained. For example, in Leh v. Commissioner, supra, all rights of the contracting parties simply came to an end and vanished. There was no transfer of any property rights. The cancellation fee was given ordinary treatment. In Commissioner v. Pittston Co., 252 F.2d 344 (2d Cir. 1958), revg. and remanding 26 T.C. 967 (1956), the Second Circuit found the contract cancellation to be the release of a naked contract right, and, therefore, no rights or property interest remaining hence ordinary treatment. On the other hand, in Dorman v. United States, 296 F.2d 27 (9th Cir. 1961), there was a more substantial property right which did not lose its existence when the contract was cancelled. In Dorman and the following cases, the courts found a transfer of rights or an exchange, hence capital treatment. See Goff v. Commissioner, 20 T.C. 561 (1953), *788 affd. 212 F.2d 875 (3d Cir. 1954); Commissioner v. Golonsky, 16 T.C. 1450 (1951), affd. 200 F.2d 72 (3d Cir. 1952). Therefore, pursuant to the above, we conclude that petitioners properly reported this $ 10,000 net loss as an ordinary loss and as a complete termination of both parties' rights to the straddle transaction. Petitioner argues in his Supplement to Petitioners' Answering Brief that United States v. Dalm, U.S. , 110 S.Ct. 1361 (March 20, 1990), and the doctrine of equitable recoupment should apply to provide petitioners relief in the event we disallow or recharacterize any of Holly's losses. As applicable herein, petitioner argues that should the ordinary losses be recharacterized as capital losses, the recharacterized capital losses from the 1979 and 1980 taxable years should be available to petitioner as a carryover to the taxable year 1982 to offset the capital gain recognized by petitioner when he sold his partnership interest. In effect, petitioner is arguing for equitable recoupment for an overpayment which occurred in the taxable year 1982. The Supreme Court in Dalm held: In sum, our decisions in Bull [Bull v. United States, 295 U.S. 247 (1935)] and Stone [Stone v. White, 301 U.S. 532 (1937)] *789 stand only for the proposition that a party litigating a tax claim in a timely proceeding may, in that proceeding, seek recoupment of a related, and inconsistent, but now time-barred tax claim relating to the same transaction. In both cases, there was no question but that the courts in which the refund actions were brought had jurisdiction. To date, we have not allowed equitable recoupment to be the sole basis for jurisdiction. United States v. Dalm, supra.
The Supreme Court concluded that the District Court did not have jurisdiction to decide Mrs. Dalm's claim for equitable recoupment, since she had already litigated the income tax deficiency in the Tax Court. Mrs. Dalm was requesting a refund from a year which had properly been before the Tax Court for a deficiency proceeding. Mrs. Dalm was requesting that equitable recoupment be the sole basis for jurisdiction in District Court. Her request was rejected. Petitioner's taxable year 1982 is not a year that is before this Court. Section 6214(b) provides that this Court shall have no jurisdiction to determine whether or not the tax for a year *2226 not before the Court has been overpaid or underpaid. Indeed, in Commissioner v. Gooch Milling & Elevator Co., 320 U.S. 418, 422 (1943) *790 the Supreme Court stated: The Internal Revenue Code, not general equitable principles, is the mainspring of the [Tax Court's] jurisdiction. * * * [The Tax Court] must remain impotent when the plea of equitable recoupment is based upon an overpayment or underpayment in such other year. * * * Therefore, we have no jurisdiction to consider petitioners' claim for equitable recoupment concerning an overpayment in a year that is not before this Court. Respondent has determined that petitioners are liable for an increased rate of interest on their income tax deficiencies pursuant to section 6621(c). Section 6621(c) only applies in those cases where a substantial underpayment is attributable to certain tax motivated transactions. Under section 6621(c)(3)(A) any straddle or any sham or fraudulent transaction is included in the definition of tax motivated transactions. Although petitioners engaged in straddle transactions, we found that the transactions were bona fide and were not tax motivated or without economic substance. We also found that certain straddle transactions involving cancellation fees were in substance contract offsets and not cancellations. Accordingly, petitioners' contention *791 that the losses incurred from these transactions should be treated as ordinary losses rather than capital losses was denied. As such, there is no underpayment attributable to a tax motivated transaction, but solely to recharacterizing the losses from ordinary to capital. It follows that under the circumstances of this case section 6621(c) is not applicable. Respondent also determined that petitioners are liable for additions to tax for negligence or an intentional disregard of rules and regulations pursuant to section 6653(a) for the years 1979 and 1980. In his Amendment to Answer respondent alleges that petitioners are similarly liable under section 6653(a)(1) and (2) for the year 1981. Section 6653(a) for the years 1979 and 1980, and section 6653(a)(1) for the year 1981 impose an addition to tax equal to 5 percent of the deficiency if any part of any deficiency is due to negligence or intentional disregard of rules or regulations. For the year 1981, section 6653(a)(2) imposes a further addition to tax in an amount equal to 50 percent of the interest payable on the portion of the deficiency attributable to negligence or intentional disregard of rules or regulations. Pursuant to *792 section 6653(a), "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985), quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967). For the years 1979 and 1980, respondent's determination of negligence is presumed to be correct and the taxpayer has the burden of proving the determination is erroneous. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Rule 142(a). For the year 1981 respondent has the burden of proving petitioners' negligence or disregard of rules and regulations since it is a new matter raised in respondent's amendment to answer. Rule 142(a). However, we do not decide this issue on the ground of the burden of proof because the record is sufficient to enable us to ascertain the facts of the situation. After reviewing the record, we hold that petitioner disregarded rules and regulations in advising Mr. Wolff to cancel the majority of the forward contracts. The economic effect Holly was seeking was not cancellation of the majority of the contracts, but offset. Petitioner, with his background and training, knew this was a possible *793 loophole in the Internal Revenue Code and tried to take advantage of it. Unfortunately, his zealousness went beyond reasonableness and the well established rule of substance over form was disregarded. Merely labelling a transaction a "cancellation" and establishing a short paper trail to back that up does not change the fact that economically, Holly was offsetting those contracts. Petitioner cites Judge Learned Hand's passage to give credence to his own recharacterization of the transactions as cancellations: Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes. * * * Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934). While we agree that one may arrange one's own affairs to minimize tax liability, those arrangements will still be analyzed and given the characterization that matches its substance, rather than its label or form. Therefore, we find that petitioners are liable for additions to tax pursuant to section 6653(a) for the years 1979 and 1980, and section 6653(a)(1) and (2) for the year 1981. Decisions will be entered *794 under Rule 155. *2227 APPENDIX A T-BOND/GNMA TRANSACTIONS IN THE FUTURES MARKET
Date
Contracts
Scrty [4]
Settle
Price
Value
Bot [5]
Sold
1.
5/8/80
50
GNMA
3/82
$ 78.30  $ 3,946,875.00
2.
5/8/80
50
GNMA
9/82
78.50  3,925,000.00
3.
5/8/80
50
TBond
9/82
80.31  4,015,625.00
4.
5/8/80
50
TBond
3/82
80.09  4,004,687.50
5.
6/5/80
50
GNMA
3/82
77.17  3,876,562.50
6.
6/5/80
50
GNMA
9/82
77.00  3,850,000.00
7.
6/5/80
50
TBond
9/82
79.47  3,973,437.50
8.
6/5/80
50
TBond
3/82
79.72  3,985,937.50
Net Result
9.
6/18/80
60
GNMA
3/82
79.12  4,762,500.00
10.
6/18/80
60
GNMA
9/82
78.75  4,725,000.00
11.
6/18/80
60
TBond
9/82
82.84  4,970,625.00
12.
6/18/80
60
TBond
3/82
83.156 4,989,375.00
13.
6/30/80
60
GNMA
3/82
76.29  4,614,375.00
14.
6/30/80
60
GNMA
9/82
76.62  4,597,500.00
15.
6/30/80
60
TBond
9/82
79.468 4,768,125.00
16.
6/30/80
60
TBond
3/82
79.468 4,768,125.00
Net Result
17.
7/31/80
75
GNMA
3/82
72.13  5,430,468.75
18.
7/31/80
75
GNMA
9/82
72.02  5,404,687.50
19.
7/31/80
75
TBond
9/82
74.27  5,613,281.25
20.
7/31/80
75
TBond
3/82
74.30  5,620,312.50
21.
8/15/80
25
GNMA
3/82
72.00  1,800,000.00
22.
8/15/80
25
GNMA
9/82
71.21  1,791,406.25
23.
8/15/80
25
TBond
9/82
74.19  1,864,843.75
24.
8/15/80
25
TBond
3/82
74.20  1,865,625.00
25.
9/26/80
100
GNMA
3/82
68.2135
6,866,718.75
26.
9/26/80
100
GNMA
6/82
68.25  6,878,125.00
27.
9/26/80
100
TBond
9/82
71.04  7,112,500.00
28.
9/26/80
100
TBond
6/82
70.28  7,087,500.00
29.
10/8/81
100
GNMA
6/82
57.29  5,790,625.00
30.
10/8/81
100
GNMA
9/82
58.00  5,800,000.00
31.
10/8/81
100
TBond
6/82
58.30  5,893,750.00
32.
10/8/81
100
TBond
3/82
58.16  5,850,000.00
Net Result
*795 Date
Value
Profit
(Loss) [6]
5/8/80
$ 3,946,875.00
5/8/80
3,925,000.00
5/8/80
4,015,625.00
5/8/80
4,004,687.50
6/5/80
3,876,562.50
($ 70,312.50)
6/5/80
3,850,000.00
75,000.00 6/5/80
3,973,437.50
(31,250.00 6/5/80
3,985,937.50
29,687.50)
Net Result
3,125.00 6/18/80
4,762,500.00
6/18/80
4,725,000.00
6/18/80
4,970,625.00
6/18/80
4,989,375.00
6/30/80
4,614,375.00
(148,125.00)
6/30/80
4,597,500.00
127,500.00 6/30/80
4,768,125.00
(202,500.00)
6/30/80
4,768,125.00
221,250.00 Net Result
(1,875.00)
7/31/80
5,430,468.75
7/31/80
5,404,687.50
7/31/80
5,613,281.25
7/31/80
5,620,312.50
8/15/80
1,800,000.00
8/15/80
1,791,406.25
8/15/80
1,864,843.75
8/15/80
1,865,625.00
9/26/80
6,866,718.75
(363,750.00)
9/26/80
6,878,125.00
9/26/80
7,112,500.00
(365,625.00)
9/26/80
7,087,500.00
10/8/81
5,790,625.00
(1,087,500.00)
10/8/81
5,800,000.00
1,396,093.75 10/8/81
5,893,750.00
(1,193,750.00)
10/8/81
5,850,000.00
1,635,937.50 Net Result
21,406.25 Other abreviations:
MM = Million of $ CAN = Cancelled GNMA = Ginnie Mae Certificate TBond = US Treasury Bond *2228 1979-1980 STRADDLE TRANSACTIONS
Trade
Settle
ACLI X#
Line #
Date
Date
Face
L/S
Scrty.
Rate
929772
1
10/12/79
9/16/81
3MM
L
GNMA
77 9/32
929773
2
10/12/79
3/18/81
3MM
S
GNMA
77 30/32
918904
3
10/12/79
3/81
3MM
L
TBond
83 11/32
918903
4
10/12/79
9/81
3MM
S
TBond
83 1/32
929768
5
10/12/79
9/16/81
5MM
L
GNMA
77 7/32
929770
6
10/12/79
3/18/81
5MM
S
GNMA
77 28/32
929769
7
10/12/79
9/16/81
5MM
L
GNMA
77 8/32
929771
8
10/12/79
3/18/81
5MM
S
GNMA
77 29/32
918907
9
10/12/79
3/81
5MM
L
TBond
83 12/32
918905
10
10/12/79
9/81
5MM
S
TBond
83 2/32
918908
11
10/12/79
3/81
5MM
L
TBond
83 11/32
918906
12
10/12/79
9/81
5MM
S
TBond
83 1/32
020094
13
10/23/79
3/18/81
3MM
L
GNMA
73 30/32
020093
14
10/23/79
9/16/81
3MM
S
GNMA
73 17/32
020053
15
10/23/79
9/81
3MM
L
TBond
79 16/32
020052
16
10/23/79
3/81
3MM
S
TBond
79 20/32
CAN929768
17
10/24/79
9/16/81
5MM
L
GNMA
CAN929769
18
10/24/79
9/16/81
5MM
L
GNMA
CAN918907
19
10/24/79
3/81
5MM
L
TBond
CAN918908
20
10/24/79
3/81
5MM
L
TBond
020073
21
10/24/79
6/17/81
5MM
L
GNMA
73 14/32
020074
22
10/24/79
6/17/81
5MM
L
GNMA
73 14/32
020050
23
10/24/79
6/81
5MM
L
TBond
78 30/32
020051
24
10/24/79
6/81
5MM
L
TBond
78 30/32
105623
25
1/23/80
3/18/81
10MM
L
GNMA
77 25/32
105622
26
1/23/80
6/17/81
10MM
S
GNMA
77 21/32
105625
27
1/23/80
9/1/81
10MM
L
TBond
79 13/32
105624
28
1/23/80
6/1/81
10MM
S
TBond
79 15/32
*796 Line Tr.
ACLI X#
Price
G/L
O/C
Cl/Beg.
929772
2,318,437.50
0
14
929773
(2,338,125.00)
0
13
918904
2,500,312.50
0
16
918903
(2,490,937.50)
0
15
929768
3,860,937.50
C
17
929770
(3,893,750.00)
0
25
929769
3,862,500.00
C
18
929771
(3,895,312.50)
0
25
918907
4,168,750.00
C
19
918905
(4,153,125.00)
0
27
918908
4,167,187.50
C
20
918906
(4,151,562.50)
0
27
020094
2,218,125.00
120,000.00
0 2
020093
(2,205,937.50)
(112,500.00)
O
1
020053
2,385,000.00
105,937.50
0 4
020052
(2,388,750.00)
(111,562,50)
O
3
CAN929768
(200,000.00)
C
5
CAN929769
(201,562.50)
C
7
CAN918907
(218,750.00)
C
9
CAN918908
(217,187.50)
C
11
020073
3,671,875.00
O
26
020074
3,671,875.00
0
26
020050
3,946,875.00
0
28
020051
3,946,875.00
0
28
105623
7,778,125.00
10,937.50
0 6 & 8
105622
(7,765,625.00
421,875.00
0 21 & 22
105625
7,940,625.00
364,062.50
0 10 & 12
105624
(7,946,875.00)
53,125.00
0 23 & 24
STRADDLES OPENED AND CLOSED - 1980
Trade
Settle
ACLI X#
Line #
Date
Date
Face
L/S
Scrty.
Rate
147848
1
6/20/80
12/16/81
6MM
L
GNMA
80 10/32
147847
2
6/20/80
6/19/82
6MM
S
GNMA
76 26/32
147849
3
6/20/80
6/1/82
6MM
L
TBond
83 8/32
147850
4
6/20/80
12/1/81
6MM
S
TBond
83 20/32
150081
5
6/30/80
6/16/82
6MM
L
GNMA
76 5/32
150082
6
6/30/80
12/16/81
6MM
S
GNMA
76 15/32
150083
7
6/30/80
12/1/81
6MM
L
TBond
79 14/32
150084
8
6/30/80
6/1/82
6MM
S
TBond
79 12/32
Line Tr.
ACLI X#
Price
G/L
O/C
Cl/Beg.
147848
4,818,750.00
0
6
147847
(4,788,750.00)
0
5
147849
4,995,000.00
0
8
147850
(5,017,500.00)
0
7
150081
4,569,375.00
219,375.00
0 2
150082
(4,588,125.00)
(230,625.00)
0
1
150083
4,766,250.00
251,250.00
0 4
150084
(4,762,500.00)
(232,500.00)
0
3
APPENDIX *797 B-2 1980 - 1982 STRADDLE TRANSACTIONS Trade
Settle
ACLI X#
Line #
Date
Date
Face
L/S
Scrty.
Rate
164941
1
8/29/80
9/16/81
10MM
L
GNMA
70 6/32
164940
2
8/29/80
3/17/82
10MM
S
GNMA
70 6/32
164943
3
8/29/80
3/1/82
10MM
L
TBond
72 20/32
164942
4
8/29/80
9/18/81
10MM
S
TBond
72 10/32
178424
5
10/22/80
9/16/81
2.9MM
L
GNMA
70 23/32
178425
6
10/22/80
3/17/82
2.9MM
S
GNMA
70 22/32
CAN178424
7
10/28/80
9/16/81
2.9MM
L
GNMA
CAN164941
8
10/28/80
9/16/81
10MM
L
GNMA
CAN164943
9
10/28/80
3/82
10MM
L
TBond
180286
10
10/28/80
12/16/81
2.9MM
L
GNMA
67 8/32
180285
11
10/28/80
12/16/81
10MM
L
GNMA
67 8/32
180287
12
10/28/80
12/16/81
10MM
L
TBond
68 10/32
181467
13
11/5/80
12/80
1MM
L
TBond
68
181466
14
11/5/80
3/81
1MM
S
TBond
68 20/32
182250
15
11/7/80
12/80
1MM
L
TBond
67
182251
16
11/7/80
3/81
1MM
S
TBond
67 20/32
CAN181467
17
11/25/80
12/80
1MM
L
TBond
CAN181466
18
11/25/80
3/81
1MM
S
TBond
CAN182250
19
11/25/80
12/80
1MM
L
TBond
CAN182251
20
11/25/80
3/81
1MM
S
TBond
390801
21
9/18/81
3/17/82
2.5MM
L
GNMA
58 1/32
390800
22
9/18/81
3/17/82
.9MM
L
GNMA
58
390799
23
9/18/81
6/16/82
9.5MM
L
GNMA
58 2/32
390802
24
9/18/81
12/16/81
5.6MM
S
GNMA
57 25/32
390803
25
9/18/81
12/16/81
2.4MM
S
GNMA
57 26/32
390804
26
9/18/81
12/16/81
4.9MM
S
GNMA
57 27/32
390805
27
9/18/81
9/18/81
5.1MM
L
TBond
59
390806
28
9/18/81
9/18/81
4.9MM
L
TBond
58 24/32
390808
29
9/18/81
12/1/81
4.9MM
S
TBond
59 11/32
391075
30
9/18/81
12/1/81
5.1MM
S
TBond
59 16/32
436789
31
3/4/82
3/17/82
9.5MM
L
GNMA
63 5/32
436790
32
3/4/82
6/16/82
9.5MM
S
GNMA
62 13/32
*798 Line Tr.
ACLI X#
Price
G/L
O/C
Cl/Beg.
164941
7,018,750.00
C
8
164940
(7,018,750.00)
0
21,22,31
164943
7,262,500.00
C
9
164942
(7,231,250.00)
0
27 & 28
178424
2,050,843.75
C
7
178425
(2,049,937.50)
0
31
CAN178424
(100,593.75)
C
5
CAN164941
(293,750.00)
C
1
CAN164943
(421,875.00)
C
3
180286
1,950,250.00
0
24, 25, 26
180285
6,725,000.00
0
24, 25, 26
180287
6,831,250.00
0
29 & 30
181467
680,000.00
C
17
181466
(686,250.00)
C
18
182250
670,000.00
C
19
182251
(676,250.00)
C
20
CAN181467
10,000.00
C
13
CAN181466
(15,000.00)
C
14
CAN182250
20,000.00
C
15
CAN182251
(25,000.00)
C
16
390801
1,450,781.25
0
2
390800
522,000.00
113,593.75 [1]
0
2
390799
5,515,937.50
0
32
390802
(3,235,750.00)
0
10 & 11
390803
(1,387,500.00)
0
10 & 11
390804
(2,834,343.75)
(1,217,656.25) [2]
0
10 & 11
390805
3,009,000.00
0
4
390806
2,878,750.00
1,343,500.00 [3] *799 0
4
390808
(2,907,843.75)
0
12
391075
(3,034,500.00)
(888,906.25 [4] )
0
12
436789
5,999,843.75
682,468.75 [5]
0
2 & 6
436790
(5,928,593.75)
412,656.25
0
23
*2229 APPENDIX C-1 Futures contract prices New York Edition, Wall Street Journal GNMA CONTRACTS Settle
AGS price on
Trade Date
Date
High [7] *800 Low
Settle
forward contract(s)
10/12/79
3/81
78-02
76-30
78-03
77-30; 77-28; 77-29
9/81
77-21
77-00
77-23
77-09; 77-07; 77-08
10/23/79
3/81
74-24
73-26
73-28
73-30
9/81
74-07
73-09
73-16
73-17
10/24/79
6/81
75-05
73-12
74-18
73-14
9/81
74-13
73-05
74-11
Can. 73-07 [8]
1/23/80
3/81
77-30
77-24
77-29
77-25
6/81
77-26
77-19
77-26
77-21
6/20/80
12/81
81-06
80-03
81-11
80-10
6/82
80-16
79-26
80-27
76-26
6/30/80
12/81
77-06
76-14
77-04
76-15
6/82
76-26
76-04
76-24
76-05
8/29/80
9/81
71-18
70-06
71-16
70-06
3/82
71-21
70-22
71-16
70-06
10-22-80
9/81
70-23
70-01
70-01
70-23
3/82
70-22
70-01
69-31
70-22
10/28/80
9/81
68-19
67-31
68-15
Can. 67-08
12/81
68-30
67-31
68-19
67-08
9/18/81
12/81
59-06
58-23
59-05
57-25; 57-26; 57-27
3/82
59-09
58-26
59-07
58-01; 58-00
6/82
59-09
58-28
59-09
58-02
*2230 Appendix C-2 Futures contract prices New York Edition, Wall Street Journal TREASURY BOND CONTRACTS Settle
AGS price on
Trade Date
Date
High
Low
Settle
forward contract(s)
10/12/79
3/81
83-10
82-19
83-11
83-11; 83-12
9/81
83-05
82-17
83-05
83-01; 83-02
10/23/79
3/81
80-05
79-05
79-03
79-20
9/81
80-00
79-00
79-00
79-16
10/24/79
3/81
80-27
78-22
80-05
Can. 79-00
6/81
80-12
78-22
80-03
78-30
1/23/80
6/81
79-28
79-14
79-23
79-15
9/81
79-25
79-13
79-20
79-13
6/20/80
12/81
84-08
83-20
84-13
83-20
6/82
83-26
83-01
84-02
83-08
6/30/80
12/81
80-17
79-13
80-14
79-14
6/82
80-10
79-11
80-09
79-12
8/29/80
9/81
74-05
72-20
74-01
72-10
3/82
74-09
73-00
74-09
72-20
10/28/80
12/81
70-00
68-24
69-14
68-10
3/82
70-04
69-01
69-20
Can. 68-10
11/5/80
12/80
70-03
66-18
66-17
68-00
3/81
70-16
66-30
67-02
68-20
11/7/80
12/80
66-25
65-20
66-02
67-00
3/81
67-14
66-10
66-21
67-20
11/25/80
12/80
69-12
68-04
68-06
Can. 69-00
3/81
70-14
69-10
69-11
Can. 70-04
9/18/81
9/81
59-21
59-13
59-22
59-00; 58-24
12/81
60-14
59-28
60-06
59-11; 59-16
*801 Footnotes
1. Section 6621(d) was redesignated as section 6621(c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. All references herein are to the redesignated section.↩
2. All future references to section 108 are to section 108 of the Deficit Reduction Act of 1984 as amended.↩
3. Section 1234A was added to the Internal Revenue Code by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 507(a), 95 Stat. 172, 333. All future references to section 1234A are to this section as originally enacted.↩
4. Scrty = Security↩
5. Bot = Bought. The face value of each contract was $ 100,000. ↩
6. The profit and loss figures do not include commissions.↩
1. Gain figure represents gain realized by offsetting $ 3.4 million of Contract #164940 (line 2) by lines 21 and 22.↩
2. Loss figure represents total loss realized on closing transactions on lines 10 and 11 by transactions shown on lines 24 thru 26. ↩
3. Gain figure represents total gain realized by offsetting transaction shown on line 4 by transactions shown on lines 27 and 28. 4. Loss figure represents total loss realized by offsetting transaction shown on line 12 by transactions shown on lines 29 and 30. ↩
5. Gain figure represents gain realized by offsetting $ 6.6 million of Contract #164940 (line 2) and line 6 by line 31.↩
7. Pricing in this chart is designated 00-00. The number after the dash is the numerator of a fraction in which 32 is the denominator. For example, 78-02 is 78 2/32.
8. Can. = Cancellation. AGS' prices on contracts that were cancelled is based upon cancellation fees. We are treating the cancellation fee as the amount of built-in gain or loss at time of cancellation. We have not allowed for any commissions which may have been included in the cancellation fees.↩